IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.CYPRUS AMAX MINERALS COMPANY, | : | |
| | : | Case No. 11-CV-252-TCK-PJC |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| 1.TCI PACIFIC COMMUNICATIONS, INC., | : | |
| 2.VIACOM, INC., | : | |
| 3.CBS CORPORATION and | : | |
| 4.CBS OPERATIONS, INC. | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Cyprus Amax Minerals Company ("Cyprus Amax") brings this Complaint and asserts the following claims against Defendants CBS Corporation ("CBS Corp."), CBS Operations, Inc. ("CBS Op."), TCI Pacific Communications, Inc. ("TCI"), and Viacom, Inc. ("Viacom") (CBS Corp., CBS Op., TCI and Viacom are hereinafter collectively referred to as "Defendants"), alleging as follows:

## I.      NATURE OF THE CASE

1.      This matter arises from the discovery of alleged releases of hazardous substances into the environment (i.e., environmental contamination) in the City of Collinsville, Oklahoma and surrounding areas, which are alleged to be attributable to the historical operations of two former zinc smelting facilities located a short distance south of Collinsville. Cyprus Amax is the alleged successor to the corporate parent of a company that operated one of the former smelting facilities and is cooperating with state and federal authorities to investigate and remediate the alleged environmental contamination.  Cyprus Amax has incurred, and will continue to incur, substantial response costs in doing so.  Defendants are the successors to and/or the indemnitors of the successors to the liabilities of the corporate parent

that dominated and controlled, and was the "alter ego" of, the entity that owned and/or operated the other former smelting facility.  Defendants are accordingly liable for the costs of investigating and remediating the environmental contamination.  Unlike Cyprus Amax, however, Defendants have refused and failed to participate to any extent in the investigation or remediation of the environmental contamination.  Cyprus Amax brings this action against Defendants pursuant to Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA") and Oklahoma law to (a) recover the response costs it has incurred and will incur in the cleanup of the alleged environmental contamination in Collinsville and (b) obtain a declaratory judgment that Defendants are responsible for contribution and/or reimbursement of future response costs to be incurred by Cyprus Amax.

II.    **PARTIES**

2.    Cyprus Amax is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 333 North Central Avenue in Phoenix, Arizona.

3.    Defendant CBS Corp. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 51 West 52nd Street in New York, New York.

4.    Defendant CBS Op. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 51 West 52nd Street in New York, New York.

5.    Defendant TCI is a corporation organized and existing under the laws of the State of Delaware.  On information and belief, TCI's principal place of business is located in Colorado.

6.      Defendant Viacom is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 1515 Broadway, New York, New York.

## III.    <u>JURISDICTION AND VENUE</u>

7.      This Court has jurisdiction over the present matter pursuant to 28 U.S.C. § 1331, which provides for original jurisdiction of the federal district courts in any civil action arising under the Constitution, laws or treaties of the United States, and pursuant to 28 U.S.C. § 1367(a), which provides for supplemental jurisdiction over state law claims that are so related to the federal law claims in the action that they form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because a substantial part of the events, acts and/or omissions giving rise to the claims stated herein, including releases of hazardous substances, occurred in this District.

9.      Personal jurisdiction is properly exercised over Defendants in that Defendants are the successors to and/or the indemnitors of the successors to the entities that engaged in acts and omissions within Oklahoma that have caused injury and damage to Cyprus Amax within and outside of Oklahoma, and because Defendants have deliberately engaged in regular business activities in Oklahoma constituting continuous and systematic contacts with the State.

IV.   **FACTUAL ALLEGATIONS**

**Overview of Former Zinc Smelters**

10.    The City of Collinsville, Oklahoma is situated in Tulsa and Rogers Counties, approximately 20 miles north of Tulsa in northeast Oklahoma.

11.    Two former zinc smelting facilities are located approximately one mile south of Collinsville.  These two former zinc smelting facilities are known as the Tulsa Fuel and Manufacturing Zinc Smelter and the Bartlesville Zinc Smelter (hereinafter the "TFM Smelter" and the "BZ Smelter" respectively).  Both the TFM Smelter and the BZ Smelter used horizontal retort furnaces to distill zinc ore into slab zinc, which was in high demand in the early 1900s.

12.    The TFM Smelter was located on an approximately 61-acre site approximately one and one third (1 1/3) miles south of downtown Collinsville ("the TFM Smelter Site").

13.    Between 1911 and 1925, the TFM Smelter was nominally owned and/or operated by the Tulsa Fuel and Manufacturing Company ("TFMC"), a corporation organized under the laws of the State of Kansas in 1906.

14.    At all relevant times, TFMC was dominated and controlled by, was operated for the benefit of, and was the "alter ego" of, the New Jersey Zinc Company ("NJ Zinc"), a corporation organized under the laws of the State of New Jersey.  As a result of this domination and control of TFMC, NJ Zinc was the "alter ego" of TFMC, and as such, is liable for all liabilities of TFMC.

15.    Defendants are the indemnitors of the corporate successors and/or the corporate successors to NJ Zinc, and as such, are liable for all liabilities of NJ Zinc, including the liabilities of TFMC.

4

16.     Between 1911 and 1918, the Bartlesville Zinc Company ("BZ Company") owned and operated the BZ Smelter, located on an approximately 40-acre portion of a 220-acre property then owned by BZ Company, approximately one-quarter (1/4) of a mile from the TFM Smelter Site ("the BZ Smelter Site").

17.     BZ Company was allegedly formerly owned by American Metal Company, Ltd.  Cyprus Amax is the alleged successor to American Metal Company, Ltd.

**Overview of Environmental Conditions
and Remediation of the Smelters and Collinsville**

18.     Starting in or about 1992, the Oklahoma Department of Environmental Quality ("ODEQ") and the United States Environmental Protection Agency ("USEPA") undertook investigations of environmental conditions at the TFM Smelter Site and BZ Smelter Site.  According to ODEQ and USEPA, these investigations revealed high concentrations of metals, including zinc, cadmium, lead and arsenic, at these Sites.

19.     Cyprus Amax is currently investigating the environmental contamination at the BZ Smelter Site pursuant to the terms of a Consent Agreement and Final Order entered by and between ODEQ and Cyprus Amax in May 1996.

20.     By contrast, despite demands and requests by USEPA and ODEQ, Defendants have refused to participate in any investigation or remediation of the TFM Smelter Site, and ODEQ and USEPA are currently addressing the environmental contamination at the TFM Smelter Site without any participation from any of the Defendants.

21.     As part of the investigation of the TFM Smelter Site, ODEQ and USEPA additionally investigated environmental conditions in residential, commercial and public areas of the City of Collinsville (the "Collinsville Town Site").  According to ODEQ and USEPA,

the investigations revealed the presence of metals in soils at concentrations higher than would typically be found in such areas.

22.     According to ODEQ and USEPA, some or all of the elevated metals concentrations detected at the Collinsville Town Site are attributable, at least in part, to the operations of the former TFM Smelter as a result of the disposal of hazardous substances via (a) air emissions from such operations and (b) the historical utilization of smelter wastes by Collinsville residents for yard fill or construction purposes.

23.     To address the environmental contamination detected at the Collinsville Town Site, ODEQ and USEPA determined that a comprehensive soil sampling and remediation program for the Collinsville Town Site was necessary (the "Collinsville Soil Program").

24.     ODEQ and/or USEPA requested that Cyprus Amax, as the alleged successor to the American Metal Company, Inc. (the former parent company of BZ Company), perform the work required by the Collinsville Soil Program.

25.     Cyprus Amax agreed to cooperate with ODEQ and USEPA and perform the Collinsville Soil Program, pursuant to a 2009 Consent Decree entered by and between ODEQ and Cyprus Amax.

26.     By contrast, defendants have refused to  participate in any investigation or remediation activities at the Collinsville Town Site, notwithstanding that they are the successors to and/or the indemnitors of the successors to NJ Zinc, which dominated and controlled the operations of TFMC and was the "alter ego" of TFMC.

**NJ Zinc Dominated and Controlled the Operations of TFMC**

27.     The TFM Smelter was nominally owned and operated by TFMC, which also owned the TFM Smelter Site.

28.     Upon information and belief, at all relevant times, TFMC was a subsidiary of NJ Zinc or a "dummy" or "sham" corporation and was dominated and controlled by, and for the benefit and as a mere instrumentality of, NJ Zinc, such that each entity is the "alter ego" of the other and the two should be treated as a single legal entity.

29.     On information and belief, as of 1912, TFMC purportedly was owned by seven individuals including one or more officers of NJ Zinc.  As shown below, at times relevant hereto, these individuals and/or the subsequent owners of TFMC (including NJ Zinc) caused TFMC to be dominated and controlled by, and operated as a mere instrumentality and for the benefit of, NJ Zinc, such that TFMC was the "alter ego" of NJ Zinc.

30.     At times relevant hereto, NJ Zinc treated and referred to TFMC as a direct or indirect subsidiary of NJ Zinc, as evidenced by contemporaneous NJ Zinc corporate records and publications and also by contemporaneous public records.

a)     In the July 1919 issue of *Zinc,* a monthly magazine published by NJ Zinc for employees of the company and its subsidiaries, NJ Zinc specifically listed "The Tulsa Fuel and Manufacturing Company" at Collinsville, Oklahoma as one of its "subsidiary companies" in an article titled "Properties of the New Jersey Zinc Company."

b)     A 1912 annual report of the United States Department of the Interior, United States Geological Survey, entitled "Mineral Resources of the United States," identified TFMC as "a subsidiary of Prime Western Spelter Co."  Prime Western Spelter Co. was acquired by NJ Zinc in 1902. In the 1919 article noted above, NJ Zinc also listed Prime Western Spelter Co. as one of its subsidiaries.

c)   In 1925, a publication known as "Moody's Analyses of Investments," identified "The Tulsa Fuel & Manufacturing Co." as a subsidiary of NJ Zinc.

31.   During operation of the TFM Smelter from 1911 through 1925, NJ Zinc dominated and exercised pervasive control over all of the business operations of its subsidiaries and/or the affiliates and/or dummy or sham corporations that it referred to as "subsidiaries" (including TFMC) as evidenced by contemporaneous NJ Zinc corporate records and publications and also by contemporaneous public records.

32.   In the July 1919 issue of *Zinc*, NJ Zinc admitted that operations of NJ Zinc and the entities (including TFMC) that it called its "subsidiaries" were so "interwoven" as to be largely "interdependent" in declaring that "[t]o detail the various steps necessary to turn out a commercial product and to point out the complicated interrelation of the plants and mines would make a long story; *suffice it to say that the operations of the parent Company and those of its subsidiaries are so interwoven that they are to a large extent inter-dependent.*"

33.   In the November 1918 issue of *Zinc*, in an article titled "Plan of Organization of the New Jersey Zinc Company," NJ Zinc stated that "[t]he New Jersey Zinc Company is the parent company and its lines of organization and routines carry through all the subsidiaries.  The reasons for the existence of those subsidiaries will be found in the various State laws governing corporations.  I want to impress upon you that there is no subterfuge here – we are not hiding behind some other name with ulterior motives."  This article further stated, using the example of a NJ Zinc subsidiary operating certain plants in Pennsylvania, that the subsidiary of NJ Zinc *"does not make any money, but turns its product over to the parent company [NJ Zinc] at cost.  And so will be found a similar reason wherever we operate under*

8

*another name than that of The New Jersey Zinc Company*."  On information and belief, as described in the foregoing article, TFMC similarly provided its product to NJ Zinc at cost and did not deal with any entity other than NJ Zinc or others of its subsidiaries, affiliates or instrumentalities.

34.    NJ Zinc treated and referred to the TFM Smelter as its own "operation" and its own "plant."  A February 1919 issue of *Zinc* described mining operations of NJ Zinc in Mexico as supplying ores to NJ Zinc plants in the United States including the TFM Smelter, which NJ Zinc referred to in the article as "our Collinsville plant."  Similarly, an article in the April 1916 issue of *Zinc* noted an inspection of "the Collinsville plant" by NJ Zinc personnel.

35.    NJ Zinc exercised pervasive control over all facets of the smelting operations (including TFMC's smelting operations) that it referred to as "its operations" or "its plants."  This pervasive control included (a) management of raw materials and fuel supplies, (b) waste handling, plant inspections, production rates and volumes, and (c) maintenance, shut-down and repair functions as evidenced by contemporaneous NJ Zinc business records and publications.  On information and belief, and as described below, TFMC's officers and directors were directed by and followed the instructions of NJ Zinc personnel with regard to the operations of TFMC.

36.    NJ Zinc's Ore and Fuel Department, located in its corporate offices in Chicago, Illinois, was responsible for procurement of supplies of mined ore and fuels for smelter operations that NJ Zinc treated and referred to as its "operations" or "plants," including the TFM Smelter.  An article in the November 1918 issue of *Zinc* described a J.H. Janeway as NJ Zinc's General Manager of Ore and Fuel in Chicago, "*having charge of all ores and fuels for the company operations*."  The Chicago office was similarly responsible for "all

operations" pertaining to gas supply for each of NJ Zinc's plants.  As explained in a July 1919 issue of *Zinc*, each NJ Zinc plant had a Gas department, "which is under the supervision of the Ore and Fuel department," in NJ Zinc's Chicago office, which "has charge of all operations pertaining to the gas supply for these plants."

37.     Corporate officers of NJ Zinc and General Managers of NJ Zinc's Manufacturing and Ore and Fuel Departments visited the TFM Smelter to conduct inspections. An article in the April 1916 issue of *Zinc* noted an inspection of "the Collinsville plant" [i.e., the TFM Smelter] by NJ Zinc personnel including NJ Zinc "vice president and general manager" J.E. Hayes, Jr.  Further, the September 1916 issue of *Zinc* noted a visit by a W.L. Coursen, the General Manager of NJ Zinc's Manufacturing Department, to inspect the TFM Smelter.  Likewise, the September 1917 issue of *Zinc* noted a visit to the TFM Smelter by NJ Zinc management personnel including J. H. Janeway, the General Manager of the Ore and Fuel Department.  The August 1919 and December 1919 issues of *Zinc* also noted visits to the TFM Smelter by NJ Zinc management personnel out of the corporate offices in New York and Chicago.

38.     Management personnel from NJ Zinc's corporate office in Chicago, Illinois also supervised production and maintenance at the smelter operations that NJ Zinc treated and referred to as its "plants", including the TFM Smelter.  In the July 1919 issue of *Zinc*, NJ Zinc stated that "the general office of this Company at Chicago supervises the maintenance and coordination of the plants for adjustment of their output according to the ores available from the mines and according to the orders that must be filled."  Moreover, in the Minutes of a "Special Operating Department Conference" held in NJ Zinc's corporate offices in New York in October 1920 and published in the December 1920 issue of *Zinc*, NJ Zinc Vice

President J.E. Hayes, Jr. articulated NJ Zinc's policy for maintenance of smelter equipment by NJ Zinc's subsidiaries and/or affiliates and/or dummy or sham corporations that it referred to as its "subsidiaries" (such as TFMC).

      39.    As a further indication of its pervasive domination and control of its subsidiaries and/or the affiliates and/or dummy or sham corporations that it referred to as its "subsidiaries" (including TFMC), NJ Zinc dominated and controlled the amount of pension contributions to be made by each of the entities (including TFMC) that it treated or referred to as "subsidiaries."  In a "Report of the New Jersey Zinc Pension Department" dated January 18, 1912, the NJ Zinc "Pension Board" in New York directed a "call for contributions to the Pension Fund by the Associated Companies . . . on account of expenses of administration and necessary outlay for pension allowances" anticipated in the first six months of 1912.  This Report specifically directed contributions in certain proportions "under the Pension Agreement" from each of the subsidiaries, affiliates, and/or dummy or sham corporations of NJ Zinc referred to as its "subsidiaries," including TFMC.

      40.    Similar contributions to the NJ Zinc Pension Fund were directed by the NJ Zinc "Pension Board" to be made by each of NJ Zinc's subsidiaries and/or affiliates and/or dummy or sham corporations that NJ Zinc referred to as its "subsidiaries" (including TFMC) as reflected in "Reports of the New Jersey Zinc Pension Department" from January 1, 1919 through January 1, 1926.

      41.    As a result of the pervasive domination and control of the operation of TFMC by and for the benefit and as a mere instrumentality of NJ Zinc, the two entities are legally the "alter ego" of one another and the two corporations should be treated as a single legal entity, such that NJ Zinc is liable for the liabilities of TFMC, including all liabilities

arising from environmental contamination of the TFM Smelter Site and the Collinsville Town Site (the "TFM Smelter Environmental Liabilities").

42.      TFMC was dissolved in 1926.

43.      Notwithstanding the 1926 dissolution of TFMC, NJ Zinc and its successors have been and continue to be liable for the liabilities of TFMC arising out of the activities occurring prior to the 1926 dissolution when NJ Zinc dominated and controlled TFMC, including the TFM Smelter Environmental Liabilities.

**Defendants are the Successors and/or the Indemnitors to the Successors of NJ Zinc**

44.      Defendants are the successors to and/or the indemnitors of the successors to the liabilities of NJ Zinc (and therefore of its alter ego TFMC) as a result of a series of corporate mergers.

45.      On February 25, 1966, NJ Zinc merged with Gulf & Western Industries, Inc., a Michigan corporation ("Gulf & Western Michigan").  As a result of this merger, Gulf & Western Michigan succeeded to the liabilities of NJ Zinc.  On May 9, 1967, Gulf & Western Michigan merged into Gulf & Western Industries, Inc., a Delaware corporation ("Gulf & Western Delaware").  As a result of this merger, Gulf & Western Delaware succeeded to the liabilities of NJ Zinc.  On May 1, 1986, Gulf & Western Delaware merged into Gulf + Western, Inc, a Delaware corporation, with the surviving corporation being Gulf + Western, Inc.  As a result of this merger, Gulf + Western, Inc. succeeded to the liabilities of NJ Zinc.  On or about June 2, 1989, Gulf + Western, Inc. changed its name to Paramount Communications, Inc.  Paramount Communications, Inc. retained the liabilities of NJ Zinc.

46.      On July 7, 1994, Paramount Communications, Inc. merged with Viacom Sub., Inc., a wholly-owned subsidiary of Viacom, Inc., with the surviving corporation being

Paramount Communications, Inc.  Paramount Communications, Inc. retained the liabilities of NJ Zinc.

47.     On January 3, 1995, Paramount Communications, Inc. merged into Viacom International, Inc.  On information and belief, subsequent to the merger in or about July, 1995, Viacom International, Inc.'s parent company, Viacom, Inc., sold Viacom International, Inc., the name of which was subsequently changed to TCI.  On information and belief, TCI is a corporate successor to Paramount Communications, Inc.  On information and belief, CBS Op. has an indemnification obligation to TCI with respect to liabilities of NJ Zinc.

48.     On information and belief, in 1995, Viacom International Services, Inc. was incorporated and then changed its name to Viacom International, Inc. ("Viacom International II").  On information and belief, Viacom International II succeeded to certain liabilities of Paramount Communications, Inc. and Gulf & Western Industries, Inc. and has an indemnification obligation to TCI covering the liabilities of NJ Zinc.

49.     In May 2000, Viacom, Inc. merged with CBS Corporation.  The resulting company was known as Viacom, Inc.  Following the merger, Viacom International II remained a subsidiary of Viacom, Inc.

50.     In January 2006, Viacom, Inc. split into two companies.  The existing company (then known as Viacom, Inc.) changed its name to CBS Corporation (now Defendant CBS Corp.), while the newly-formed spin-off company took the name Viacom, Inc. (now Defendant Viacom).  Viacom International II changed its name to CBS Operations, Inc. (now defendant CBS Op.).  On information and belief, Viacom, CBS Corp. and CBS Op. agreed to various indemnification obligations among and between themselves with respect to the liabilities of NJ Zinc.

51.     As a result of the foregoing transactions, Defendants are the successors to and/or the indemnitors to the successors to the liabilities of NJ Zinc (the former parent company, dominant corporate affiliate, and/or alter ego of TFMC).

### TFM Smelter Site

52.     The TFM Smelter is an abandoned zinc smelter and lead roaster that operated from 1914 through 1925.

53.     Starting in 1992, ODEQ began to investigate environmental conditions at the TFM Smelter Site.  In a Preliminary Assessment of the TFM Smelter Site, ODEQ determined that (a) groundwater contamination may exist because of large amounts of on-site smelter waste and residue and the unknown depth of the waste; (b) surface water contamination may exist because of the high potential for onsite and offsite runoff; (c) onsite soil contamination appeared widespread, with human exposure to contaminated soil occurring; (d) suspended particles may have been deposited in areas surrounding the site because site smelting operations occurred at a time when air emissions standards did not exist; and (e) onsite waste was evident on the ground surface at the site.

54.     Thereafter, in September 1994, ODEQ conducted a Site Inspection that detected high concentrations of metals, including arsenic, cadmium, lead and zinc in soils, sediment and surface water samples collected on the TFM Smelter Site.

55.     Based on the results of these site inspections, the TFM Smelter Site received a Hazardous Ranking Score ("HRS") of 50.

56.     The TFM Smelter Site was proposed for listing on the National Priorities List ("NPL") in September 1998 and was listed on the NPL on January 19, 1999 as the "Tulsa Fuel & Manufacturing Superfund Site."

14

57. In May 1999, USEPA completed a Removal Assessment Report, which concluded that an estimated 29,588 cubic yards of waste existed at the TFM Smelter Site, and that the total surface area of the site impacted by lead concentrations exceeding 500 parts per million (ppm) was 41.3 acres.

58. In July 2000, USEPA issued a Special Notice Letter to Defendant CBS Op. notifying it of alleged CERCLA liability for contamination at the TFM Smelter Site as the successor in interest to NJ Zinc.

59. By letter dated March 25, 2001, Defendant CBS Op. denied that NJ Zinc was the parent corporation of TFMC and refused to cooperate in any remediation of environmental contamination at the TFM Smelter Site.

60. ODEQ and USEPA negotiated a Cooperative Agreement under which ODEQ was designated as lead agency for the Remedial Investigation and Feasibility Study ("RI/FS") for the TFM Smelter Site, with USEPA as the supporting agency.  ODEQ and USEPA have been and are continuing to undertake activities to address contamination at the TFM Smelter Site and surrounding areas.

61. From 2005 through 2007, ODEQ's contractor performed the RI/FS at the TFM Smelter Site.  According to the RI Report, onsite and offsite surface and subsurface soils, sediments, surface water, groundwater and vegetation have been impacted by arsenic, cadmium and lead contamination from the TFM Smelter.

62. The RI Report identified offsite contamination as a concern due to the potential for human exposure to metals in surface soils.  According to the RI Report, offsite contamination may have resulted from (a) dispersion of metals through the air by emissions from stacks and furnaces during smelting operations, and/or (b) removal of onsite wastes to

offsite locations for use as yard fill, gravel for construction purposes, including driveways and roads, and gardening material.

63.     In November 2008, USEPA issued the Record of Decision ("ROD") for the TFM Smelter Site.  The selected remedy is a comprehensive approach involving sampling and on-site consolidation and capping of approximately 200,000 cubic yards of waste material on and in soils, sediments and surface water at the site, and excavation, stabilization and disposal of approximately 1,600 cubic yards of offsite waste material in soils and sediments.

### The BZ Smelter Site

64.     The BZ Smelter commenced operations in or about 1911, on approximately 40 acres of the 220-acre property then owned by BZ Company.

65.     By June 1918, operations at the BZ Smelter had ceased and the facility was dismantled.  BZ Company formally withdrew from doing business in the State of Oklahoma in 1930.

66.     Cyprus Amax voluntarily entered into a May 28, 1996 Consent Agreement and Final Order ("CAFO") with ODEQ, and pursuant to the terms of the CAFO, Cyprus Amax has performed a Focused RI/FS at the BZ Smelter Site, and is presently cooperating with ODEQ in selecting a remedy for the Site.

67.     According to ODEQ's Findings of Fact in the CAFO, TFMC and its successors in interest may be potentially responsible for remediation on or near the former BZ Smelter Site.

### The Collinsville Town Site and the Collinsville Soil Program

68.     As part of the investigation of the TFM Smelter Site, ODEQ and USEPA investigated environmental conditions in residential, commercial and public areas of the

16

Collinsville Town Site.  This investigation included soil sampling of approximately 200 residential properties in the City of Collinsville.

69.     According to ODEQ and USEPA, sampling results indicated that approximately 5% of the approximately 200 residential properties sampled contained soils with concentrations of lead, arsenic and/or cadmium above the remediation standards developed for the Collinsville Town Site, with no discernible pattern in the property locations where the elevated metals concentrations were found.

70.     According to ODEQ and USEPA, historical operations of the TFM Smelter caused the elevated metals concentrations found at the Collinsville Town Site, as a result of dispersion of metals through the air by emissions from stacks and furnaces during smelting operations at the TFM Smelter, and the removal of onsite wastes to offsite locations for use as yard fill, gravel for construction purposes, including driveways and roads, and gardening material.

71.     ODEQ and USEPA determined that a comprehensive soil sampling and remediation program for the Collinsville Town Site was necessary.

72.     This program, known as the Collinsville Soil Program or CSP, offers soil sampling to all property owners within the Collinsville Town Site for laboratory analysis and comparison to the soil remediation standards for lead, arsenic and cadmium.  Any property areas containing metals concentrations exceeding remediation standards are being remediated by excavation of impacted soils, replacement with clean soil, and restoration of vegetation. Large pieces of smelter debris are also removed from properties where found.

**The Performance of the Collinsville Soil Program by Cyprus Amax**

73.     ODEQ and/or USEPA requested that Cyprus Amax perform the work associated with the CSP, as the alleged successor to the former parent company of BZ Company.

74.     Defendants refused to participate in the remediation of the Collinsville Town Site or the CSP.

75.     Cyprus Amax entered into negotiations with ODEQ for the remediation of the Collinsville Town Site and performance of the CSP.  These negotiations culminated with ODEQ simultaneously lodging a complaint against Cyprus Amax, and a proposed consent decree between ODEQ and Cyprus Amax, with this Court on May 28, 2009.  The proposed consent decree was entered on July 21, 2009 (hereinafter, the "Consent Decree").  Pursuant to the terms of the Consent Decree, Cyprus Amax agreed to undertake comprehensive and costly response actions at the Collinsville Town Site, including preparation of a Remedial Action Work Plan, a Quality Assurance Project Plan, a Soil Sampling and Analysis Plan and a Health and Safety Plan for implementation of the CSP.

76.     In connection with these response actions, Cyprus Amax has incurred and will continue to incur cleanup and response costs, including reimbursement to ODEQ for investigative and response costs.

77.     Under the terms of the Consent Decree, Cyprus Amax has retained the right to sue or seek appropriate relief from any responsible person that was not a party to the Consent Decree and is liable for the contamination at issue.

78.     Defendants, through the former smelter operations at the TFM Smelter, are responsible and liable persons for the contamination of the Collinsville Town Site by hazardous substances.

79.     None of the Defendants was a party to the Consent Decree, nor have any of the Defendants resolved their liability for the contamination at the Collinsville Town Site.

80.     Cyprus Amax therefore brings claims against Defendants pursuant to CERCLA and Oklahoma law, seeking: (a) a declaration that Defendants are responsible for the costs of investigation, monitoring, reporting, cleanup, removal, response, and remediation of hazardous substances including, but not limited to, lead, cadmium, zinc and arsenic contaminating the Collinsville Town Site; (b) cost recovery, contribution, consequential, incidental, and general damages (including pre-judgment and post-judgment interest) to compensate Cyprus Amax for costs and damages it has incurred and will incur related to the hazardous substances and solid and hazardous wastes at the Collinsville Town Site; and (c) an award of attorneys' fees, expert fees, and other fees Cyprus Amax has incurred and will incur in conjunction with response activities at the Collinsville Town Site and this action.

## COUNT I
## COST RECOVERY PURSUANT TO CERCLA § 107, 42 U.S.C. § 9607
## AS A FORMER OWNER AND/OR OPERATOR

81.     Cyprus Amax realleges and incorporates herein by reference, as if set forth in full, Paragraphs 1 through 80 above.

82.     Cyprus Amax, CBS Corp., CBS Op., TCI and Viacom are persons within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

83.     The TFM Smelter Site and the Collinsville Town Site are both facilities within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

84.     Hazardous substances within the meaning of CERCLA section 101(14), 42 U.S.C. § 9601(14), including zinc, lead, cadmium and arsenic, were generated and released

into the environment by TFMC/NJ Zinc at the TFM Smelter Site, and were further released into the environment by TFMC/NJ Zinc at the Collinsville Town Site.

85.     These hazardous substances have contaminated the surface and subsurface soils, and have potentially contaminated sediment and surface water of the Collinsville Town Site, and the groundwater at the TFM Smelter Site.

86.     TFMC/NJ Zinc was an owner and/or operator of the TFM Smelter Site within the meaning of CERCLA section 101(20)(A), 42 U.S.C. § 9601(20)(A), at the time of disposal of hazardous substances from smelter operations at the TFM Smelter Site, as that term is defined in CERCLA section 101(29), 42 U.S.C. § 9601(29).

87.     Such disposal by TFMC/NJ Zinc constitutes a release or threatened release within the meaning of CERCLA section 101(22), 42 U.S.C. § 9601(22).

88.     Such releases by TFMC/NJ Zinc have contaminated the surface and subsurface soils, and have potentially contaminated the sediment and surface water of the Collinsville Town Site and the TFM Smelter Site, and the groundwater at the TFM Smelter Site.

89.     Accordingly, TFMC/NJ Zinc is liable under CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(2).

90.     Cyprus Amax has incurred and will continue to incur response costs and damages from releases of hazardous substances from the smelter operations of TFMC/NJ Zinc.

91.     The costs incurred by Cyprus Amax in investigating, assessing and evaluating the release or threatened releases of such hazardous substances are necessary costs of response within the meaning of CERCLA sections 101(25) and 107(a)(4)(B), 42 U.S.C. §§ 9601(25) and 9607(a)(4)(B).

92.     The response costs incurred by Cyprus Amax have been and are consistent with the National Contingency Plan, codified at 40 C.F.R. Part 300.

93.     TFMC was dominated and controlled by, and operated as a mere instrumentality by and for the benefit of NJ Zinc, such that each entity is the "alter ego" of the other and the two corporations should be treated as a single legal entity during the time that hazardous substances were disposed of at the TFM Smelter Site and released into the environment.  As such, NJ Zinc was an owner and/or operator of the TFM Smelter Site within the meaning of CERCLA section 101(20)(A), 42 U.S.C. § 9601(20)(A), at the time of disposal of hazardous substances from smelter operations at the TFM Smelter Site, as that term is defined by CERCLA section 101(29), 42 U.S.C. § 9601(29).  Accordingly, NJ Zinc is liable under CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(2).

94.     Defendants are the successors to and/or the indemnitors of the successors to the liabilities of NJ Zinc, and as such are responsible for NJ Zinc's liabilities as an owner and/or operator of the TFM Smelter Site during the time that hazardous substances were disposed from the TFM Smelter Site and released into the environment.

95.     Defendants are liable to Cyprus Amax, pursuant to CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(2), for necessary costs of response and damages incurred by Cyprus Amax to date with respect to contamination at the Collinsville Town Site, as well as for additional response costs incurred by Cyprus Amax through the date of entry of judgment in this action.

96.     Defendants are liable to Cyprus Amax for interest on such costs of response incurred and to be incurred by Cyprus Amax in connection with contamination at the

Collinsville Town Site, at the rate specified for interest on investments of the Hazardous

Substance Superfund pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a).

   **WHEREFORE,** Cyprus Amax respectfully requests that this Honorable Court (a) enter a

declaratory judgment pursuant to 28 U.S.C. § 2201 to resolve the actual case and controversy

between the parties by declaring all Defendants liable for response costs pursuant to CERCLA

(including, but not limited to, costs of investigation, monitoring, reporting, cleanup, removal,

remediation, attorneys' fees, expert fees, and other fees related to response activities),

necessitated by and incurred because of the disposal by the corporate predecessors of Defendants

of arsenic, lead, cadmium, zinc and any other hazardous substances at the Collinsville Town

Site; (b) enter judgment against all of the Defendants awarding Cyprus Amax cost recovery

pursuant to CERCLA (including pre-judgment and post-judgment interest), to compensate

Cyprus Amax for response costs it has incurred and will incur because of the disposal by the

corporate predecessors of Defendants of the hazardous substances at the Collinsville Town Site;

and (c) afford Cyprus Amax all such other and further relief, at law or in equity, to which it may

be entitled.

## COUNT II
## COST RECOVERY PURSUANT TO CERCLA § 107, 42 U.S.C. § 9607
## AS AN ARRANGER

   97.   Cyprus Amax realleges and incorporates herein by reference, as if set forth

in full, Paragraphs 1 through 96 above.

   98.   CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3), imposes liability on:

"[a]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or

arranged with a transporter for the transport for disposal or treatment, of hazardous substances

owned or possessed by such person, by any other party or entity, at any facility... owned or operated by another party or entity and containing such hazardous substances."

99.     Hazardous substances within the meaning of CERCLA section 101(14), 42 U.S.C. § 9601(14), including zinc, lead, cadmium and arsenic, were generated by TFMC at the TFM Smelter Site.

100.     On information and belief, TFMC/NJ Zinc arranged for the disposal of these hazardous substances by (a) operating the TFM Smelter in such a way as to emit hazardous substances into air which moved northward to and settled on the Collinsville Town Site due to prevailing winds out of the south and (b) arranging for the utilization of its smelter wastes by Collinsville residents for yard fill, gravel for construction purposes, including driveways and roads, and gardening material.

101.     Both the emissions of hazardous substances which settled on the Collinsville Town Site and the use of the smelter waste as yard fill and for construction purposes by the Collinsville residents constitute disposal as that term is defined by CERCLA section 101(29), 42 U.S.C. § 9601(29).

102.     TFMC was dominated and controlled by, and operated as a mere instrumentality by and for the benefit of  NJ Zinc, such that each entity is the "alter ego" of the other and the two corporations should be treated as a single legal entity during the time that such arrangements for the disposal of hazardous substances were made.  As such, NJ Zinc was an arranger liable under CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

103.     Defendants are the successors to and/or the indemnitors of the successors to the liabilities of NJ Zinc, and as such are responsible for NJ Zinc's liabilities as an arranger

for the TFM Smelter Site during the time that arrangements were made for disposal of hazardous substances from the TFM Smelter Site.

104.    Defendants are liable to Cyprus Amax, pursuant to CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3), for necessary costs of response and damages incurred by Cyprus Amax to date with respect to contamination at the Collinsville Town Site, as well as for additional response costs incurred by Cyprus Amax through the date of entry of judgment in this action.

105.    Defendants are liable to Cyprus Amax for interest on such costs of response incurred and to be incurred by Cyprus Amax in connection with contamination at the Collinsville Town Site, at the rate specified for interest on investments of the Hazardous Substance Superfund pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a).

**WHEREFORE,** Cyprus Amax respectfully requests that this Honorable Court (a) enter a declaratory judgment pursuant to 28 U.S.C. § 2201 to resolve the actual case and controversy between the parties by declaring all Defendants liable for response costs pursuant to CERCLA (including, but not limited to, costs of investigation, monitoring, reporting, cleanup, removal, remediation, attorneys' fees, expert fees, and other fees related to response activities), necessitated by and incurred because of the disposal by the corporate predecessors of Defendants of arsenic, lead, cadmium, zinc and any other hazardous substances at the Collinsville Town Site; (b) enter judgment against all of the Defendants awarding Cyprus Amax cost recovery (including pre-judgment and post-judgment interest) to compensate Cyprus Amax for response costs it has paid or will pay (including, but not limited to, costs of investigation, monitoring, reporting, cleanup, removal, remediation, attorneys' fees, expert fees, and other fees related to response activities) because of the disposal by corporate predecessors of Defendants of arsenic,

lead, cadmium, zinc and any other hazardous substances at the Collinsville Town Site; and (c) afford Cyprus Amax all such other and further relief, at law or in equity, to which it may be entitled.

**COUNT III**
**CONTRIBUTION PURSUANT TO CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1),**
**AS A FORMER OWNER AND/OR OPERATOR**

106.    Cyprus Amax realleges and incorporates herein by reference, as if set forth in full, Paragraphs 1 through 105 above.

107.    CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1), provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action . . . under section 9607(a) of this title."

108.    ODEQ initiated a civil action against Cyprus Amax pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a) in May 2009, seeking an order requiring Cyprus Amax to perform response actions at the Collinsville Town Site.

109.    As alleged in Count I, which is incorporated herein by reference, Defendants are liable to Cyprus Amax under CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(2).

110.    Accordingly, Cyprus Amax is authorized to seek contribution from Defendants following the above-referenced civil action brought under CERCLA section 107(a).

111.    Defendants are liable to Cyprus Amax, pursuant to CERCLA sections 113(f)(1) and 107(a)(2), 42 U.S.C. §§ 9613(f)(1) and 9607(a)(2), for contribution, in accordance with an allocation to be determined at trial, of necessary costs of response and

damages incurred by Cyprus Amax to date with respect to contamination at the Collinsville Town Site, as well as for additional response costs incurred by Cyprus Amax through the date of entry of judgment in this action.

112.    Defendants are liable to Cyprus Amax for interest on such costs of response incurred and to be incurred by Cyprus Amax in connection with contamination at the Collinsville Town Site, at the rate specified for interest on investments of the Hazardous Substance Superfund pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a).

**WHEREFORE,** Cyprus Amax respectfully requests that this Honorable Court (a) enter judgment against all of the Defendants awarding Cyprus Amax contribution (including pre-judgment and post-judgment interest) to compensate Cyprus Amax for response costs it has incurred and will incur (including, but not limited to, costs of investigation, monitoring, reporting, cleanup, removal, remediation, attorneys' fees, expert fees, and other fees related to response activities) because of the disposal by corporate predecessors of Defendants of arsenic, lead, cadmium, zinc and any other hazardous substances at the Collinsville Town Site; and (b) afford Cyprus Amax all such other and further relief, at law or in equity, to which it may be entitled.

<u>**COUNT IV**</u>
<u>**CONTRIBUTION PURSUANT TO CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1),**</u>
<u>**AS AN ARRANGER**</u>

113.    Cyprus Amax realleges and incorporates herein by reference, as if set forth in full, Paragraphs 1 through 112 above.

114.    CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1), provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under

section 9607(a) of this title, during or following any civil action . . . under section 9607(a) of this title."

115.     ODEQ initiated a civil action against Cyprus Amax pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a) in May 2009, seeking an order requiring Cyprus Amax to perform response actions at the Collinsville Town Site.

116.     As alleged in Count II, which is incorporated herein by reference, Defendants are liable to Cyprus Amax under CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

117.     Accordingly, Cyprus Amax is authorized to seek contribution from Defendants following the above-referenced civil action brought under CERCLA section 107(a).

118.     Defendants are liable to Cyprus Amax, pursuant to CERCLA sections 113(f)(1) and 107(a)(3), 42 U.S.C. §§ 9613(f)(1) and 9607(a)(3), for contribution, in accordance with an allocation to be determined at trial, of necessary costs of response and damages incurred by Cyprus Amax to date with respect to contamination at the Collinsville Town Site, as well as for additional response costs incurred by Cyprus Amax through the date of entry of judgment in this action.

119.     Defendants are liable to Cyprus Amax for interest on such costs of response incurred and to be incurred by Cyprus Amax in connection with contamination at the Collinsville Town Site, at the rate specified for interest on investments of the Hazardous Substance Superfund pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a).

**WHEREFORE,** Cyprus Amax respectfully requests that this Honorable Court (a) enter judgment against all of the Defendants awarding Cyprus Amax contribution (including pre-

judgment and post-judgment interest) to compensate Cyprus Amax for response costs it has

incurred and will incur (including, but not limited to, costs of investigation, monitoring,

reporting, cleanup, removal, remediation, attorneys' fees, expert fees, and other fees related to

response activities) because of the disposal by corporate predecessors of Defendants of arsenic,

lead, cadmium, zinc and any other hazardous substances at the Collinsville Town Site; and (b)

afford Cyprus Amax all such other and further relief, at law or in equity, to which it may be

entitled.

**COUNT V**
**CONTRIBUTION PURSUANT TO CERCLA § 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B),**
**AS FORMER OWNER AND/OR OPERATOR**

120.    Cyprus Amax realleges and incorporates herein by reference, as if set forth

in full, Paragraphs 1 through 119 above.

121.    CERCLA section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B), provides that

"[a] person who has resolved its liability to . . . a State for some or all of a response action or

for some or all of the costs of such action in an administrative or judicially approved settlement

may seek contribution from any person who is not party to [the] settlement [with the State]."

122.    As set forth herein, Cyprus Amax entered into a Consent Decree with

ODEQ requiring Cyprus Amax to undertake response activities to address the arsenic, lead,

cadmium and other hazardous substances disposed of by corporate predecessors of Defendants

at the Collinsville Town Site.

123.    Pursuant to the terms of the above judicially-approved Consent Decree,

Cyprus Amax resolved its CERCLA liability.

124.    None of the Defendants is a party to the Consent Decree.

125.    As alleged in Count I, which is incorporated herein by reference, Defendants are liable to Cyprus Amax under CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(2).

126.    Accordingly, Cyprus Amax is authorized to seek contribution from Defendants for the matters addressed in the above-referenced Consent Decree.

127.    Defendants are liable to Cyprus Amax, pursuant to CERCLA sections 113(f)(3)(B) and 107(a), 42 U.S.C. §§ 9613(f)(3)(B) and 9607(a), for contribution, in accordance with an allocation to be determined at trial, of necessary costs of response and damages incurred by Cyprus Amax to date with respect to contamination at the Collinsville Town Site, as well as for additional response costs incurred by Cyprus Amax through the date of entry of judgment in this action.

128.    Defendants are liable to Cyprus Amax for interest on such response costs incurred and to be incurred by Cyprus Amax in connection with contamination at the Collinsville Town Site, at the rate specified for interest on investments of the Hazardous Substance Superfund, pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a).

**WHEREFORE,** Cyprus Amax respectfully requests that this Honorable Court (a) enter judgment against all of the Defendants awarding Cyprus Amax contribution (including pre-judgment and post-judgment interest) to compensate Cyprus Amax for response costs it has incurred and will incur (including, but not limited to, costs of investigation, monitoring, reporting, cleanup, removal, remediation, attorneys' fees, expert fees, and other fees related to response activities) because of the disposal by corporate predecessors of Defendants of arsenic, lead, cadmium, zinc and any other hazardous substances at the Collinsville Town Site; and (b)

afford Cyprus Amax all such other and further relief, at law or in equity, to which it may be entitled.

<u>COUNT VI</u><br>
<u>CONTRIBUTION PURSUANT TO CERCLA § 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B),</u><br>
<u>AS AN ARRANGER</u>

129.    Cyprus Amax realleges and incorporates herein by reference, as if set forth in full, Paragraphs 1 through 128 above.

130.    CERCLA section 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B), provides that "[a] person who has resolved its liability to . . . a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to [the] settlement [with the State]."

131.    As set forth herein, Cyprus Amax entered into a Consent Decree with ODEQ requiring Cyprus Amax to undertake response activities to address the arsenic, lead, cadmium and other hazardous substances disposed of by corporate predecessors of CBS at the Collinsville Town Site.

132.    Pursuant to the terms of the above judicially-approved Consent Decree, Cyprus Amax resolved its CERCLA liability.

133.    None of the Defendants is a party to the Consent Decree.

134.    As alleged in Count I, which is incorporated herein by reference, Defendants are liable to Cyprus Amax under CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(3).

135.    Accordingly, Cyprus Amax is authorized to seek contribution from Defendants for the matters addressed in the above-referenced Consent Decree.

136.    Defendants are liable to Cyprus Amax, pursuant to CERCLA sections 113(f)(3)(B) and 107(a), 42 U.S.C. §§ 9613(f)(3)(B) and 9607(a), for contribution, in accordance with an allocation to be determined at trial, of necessary costs of response and damages incurred by Cyprus Amax to date with respect to contamination at the Collinsville Town Site, as well as for additional response costs incurred by Cyprus Amax through the date of entry of judgment in this action.

137.    Defendants are liable to Cyprus Amax for interest on such response costs incurred and to be incurred by Cyprus Amax in connection with contamination at the Collinsville Town Site, at the rate specified for interest on investments of the Hazardous Substance Superfund, pursuant to CERCLA section 107(a), 42 U.S.C. § 9607(a).

**WHEREFORE,** Cyprus Amax respectfully requests that this Honorable Court (a) enter judgment against all of the Defendants awarding Cyprus Amax contribution (including pre-judgment and post-judgment interest) to compensate Cyprus Amax for response costs it has incurred and will incur (including, but not limited to, costs of investigation, monitoring, reporting, cleanup, removal, remediation, attorneys' fees, expert fees, and other fees related to response activities) because of the disposal by corporate predecessors of Defendants of arsenic, lead, cadmium, zinc and any other hazardous substances at the Collinsville Town Site; and (b) afford Cyprus Amax all such other and further relief, at law or in equity, to which it may be entitled.

## COUNT VII
## <u>DECLARATORY JUDGMENT PURSUANT TO CERCLA § 113(g)(2),</u>
## <u>42 U.S.C. § 9613(g)(2)</u>

138.    Cyprus Amax realleges and incorporates herein by reference, as if set forth in full, Paragraphs 1 through 137 above.

139.    There exists an actual controversy between Cyprus Amax and Defendants as to their respective rights and duties concerning the investigation and remediation of the contamination at and around the Collinsville Town Site.

140.    Cyprus Amax seeks a declaratory judgment pursuant to CERCLA section 113(g)(2), 42 U.S.C. § 9613(g)(2), as well as 28 U.S.C. § 2201, as to the rights and duties of the parties and, in particular, a determination of the liability of Defendants to bear or share the necessary costs of response and damages that will be incurred by Cyprus Amax with respect to remediation of the contamination at the Collinsville Town Site pursuant to CERCLA section 113(g)(2)(B), 42 U.S.C. § 9613(g)(2)(B).

**WHEREFORE,** Cyprus Amax respectfully requests that this Honorable Court (a) enter a declaratory judgment pursuant to 28 U.S.C. § 2201 to resolve the actual case and controversy between the parties by declaring all of the Defendants liable for response costs pursuant to CERCLA (including, but not limited to, costs of investigation, monitoring, reporting, cleanup, removal, remediation, attorneys' fees, expert fees, and other fees related to response activities), necessitated by and incurred because of the disposal by the corporate predecessors of Defendants of arsenic, lead, cadmium, zinc and any other hazardous substances at the Collinsville Town Site; and (b) afford Cyprus Amax all such other and further relief, at law or in equity, to which it may be entitled.

## COUNT VIII
## UNJUST ENRICHMENT

141.    Cyprus Amax realleges and incorporates herein by reference, as if set forth in full, Paragraphs 1 through 140 above.

142.    Cyprus Amax has, by its expenditures in treating, remediating, and removing metals and other smelter waste materials in soils, sediments and surface water at the

Collinsville Town Site, incurred the cost of handling, treating, and/or disposing of metals and other smelter wastes, which Defendants by law and equity should bear.

143.    The past and future labor and expense incurred by Cyprus Amax to treat, remediate, and/or remove metals and other smelter waste materials in soils, sediments and surface water at the Collinsville Town Site as a result of the operations of the TFM Smelter has conferred and will continue to confer substantial economic benefits on Defendants.

144.    Defendants have knowingly retained these substantial economic benefits and have therefore, been unjustly enriched.

145.    No remedy at law can adequately compensate Cyprus Amax for the damages occasioned by the conscious choice on the part of Defendants to contaminate the Collinsville Town Site and allow the site to remain contaminated, by refusing to accept responsibility and incur expenses to properly investigate, treat, and/or dispose of metals and other smelter wastes at the Collinsville Town Site.

146.    Cyprus Amax is entitled to recovery from Defendants for the value of the benefits which have been and will continue to be conferred upon it by Cyprus Amax, the costs saved by Defendants by avoiding the responsibility to properly investigate, treat, and/or dispose of metals and other smelter wastes, and/or the disgorgement of all profits or returns that Defendants have derived from such wrongful conduct.

**WHEREFORE**, Cyprus Amax respectfully requests that this Honorable Court (a) enter judgment against all of the Defendants awarding Cyprus Amax consequential, incidental, and general damages (including pre-judgment and post-judgment interest) and attorneys' fees (as allowed by law); and (b) grant Cyprus Amax all such other and further relief, at law or in equity, to which it may be entitled.

Respectfully submitted,

s/Reid E. Robison
Reid E. Robison, OBA #7692
Timothy J. Bomhoff, OBA #13172
**McAfee & Taft A Professional Corporation**
211 N. Robinson
Two Leadership Square, 10th Floor
Oklahoma City, OK  73102
Telephone: 405-235-9621
Facsimile:  405-235-0439
reid.robison@mcafeetaft.com


OF COUNSEL
John F. Stoviak, Esquire
(Pending *pro hac vice* admission)
Cathleen M. Devlin, Esquire
(Pending *pro hac vice* admission)
Christina D. Riggs, Esquire
(Pending *pro hac vice* admission)
**Saul Ewing LLP**
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186
Telephone: 215-972-1095
Facsimile: 215-972-1921

Counsel for Plaintiff
Cyprus Amax Minerals Company

Dated:  April 26, 2011