UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CYPRUS AMAX MINERALS COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 11-CV-0252-CVE-PJC |
| | ) | |
| **TCI PACIFIC COMMUNICATIONS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court are the following motions: Plaintiff Cyprus Amax Minerals Company's Daubert Motion to Exclude Opinions of Defendants' Experts Jennifer Stevens, Ph.D. and Brief in Support (Dkt. # 124); Defendants' Motion to Exclude Testimony of James Burrows and Integrated Brief in Support (Dkt. # 125); Defendants' Motion to Exclude Testimony of Bala Dharan and Integrated Brief in Support (Dkt. # 126); Defendants' Motion to Exclude Testimony of Irwin Steinhorn and Integrated Brief in Support (Dkt. # 127). Plaintiff asks the Court to exclude the testimony of defendant's expert historian, Jennifer Stevens, Ph.D, because she is attempting to offer expert opinions outside of her expertise. Defendant seeks to exclude the testimony of three of plaintiff's expert witnesses.

**I.**

Cyprus Amax Minerals Company (Cyprus) is the successor-in-interest to a corporate parent company that formerly operated a zinc smelting facility near Collinsville, Oklahoma.[1] Cyprus's

---

[1] For the purpose of this Opinion and Order, the Court will provide a brief summary of plaintiff's allegations and the procedural history of the case. The Court will discuss specific facts applicable to each expert's proposed testimony, but the Court finds that it not necessary to provide an extensive overview of the case when ruling on the pending motions to exclude expert testimony.

corporate parent operated the Bartlesville Zinc Smelter (BZ Smelter), but there was another zinc smelting facility in Collinsville known as the Tulsa Fuel and Manufacturing Zinc Smelter (TFM Smelter). In 1992, the Oklahoma Department of Environmental Quality (ODEQ) and the Environmental Protection Agency (EPA) opened an investigation into environmental damage allegedly caused by the zinc smelting facilities, and ODEQ later filed a lawsuit against Cyprus. Dkt. # 106, at 6. Cyprus states that it agreed to cooperate with the EPA and ODEQ, and it entered a consent decree with ODEQ to resolve the lawsuit. Id. at 6. Cyprus alleges that the EPA and ODEQ have demanded that TCI Pacific Communications, Inc. (TCI), Viacom, Inc. (Viacom), CBS Corporation, and CBS Operations, Inc. assume responsibility for the TFM Smelter as successors-in-interest to the original owner, Tulsa Fuel and Management Company (TFMC), but those parties have refused to participate in investigation or remediation of environmental conditions caused by operation of the TFM Smelter.

On April 25, 2011, Cyprus filed this case alleging that New Jersey Zinc Company (NJ Zinc) was the parent company of TFMC and, under an alter ego theory, that NJ Zinc was responsible for the debts and liabilities of TFMC. Cyprus sought to hold the defendants liable for contribution under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (CERCLA), and they also alleged an unjust enrichment claim under state law. TFMC and NJ Zinc are no longer existing entities, but Cyprus claims that TCI, Viacom, CBS Corporation, and CBS Operations, Inc. are the successors-in-interest of NJ Zinc. Cyprus voluntarily dismissed Viacom and CBS Corporation from the case. Dkt. ## 59, 63. The remaining defendants, TCI and CBS Operations, Inc., filed a motion (Dkt. # 53) asking the Court to decide whether Kansas law applied to the issue of piercing the corporate veil under an alter ego theory. The judge then assigned

to the case, the Honorable Gregory K. Frizzell, found that Kansas law applied to this case, because laws of the state of incorporation ordinarily governed the disputed issue and TFMC was incorporated in Kansas. Dkt. # 89. The case was reassigned to the Honorable John E. Dowdell. Dkt. # 105. TCI and CBS Operations, Inc. filed a motion to dismiss (Dkt. # 114) Cyprus' claims for failure to state a claim upon which relief can be granted. The motion to dismiss was granted in part and denied in part. Dkt. # 142. All pending claims against CBS Operations, Inc. were dismissed with prejudice, and the unjust enrichment claim and certain of Cyprus' CERCLA claims were dismissed as to TCI. However, Counts III through VII of the amended complaint remain pending against TCI.[2] Neither Cyprus nor TCI has demanded a jury trial on any issue. The case has been randomly reassigned to the undersigned following the recusal of Judge Dowdell. Dkt. # 144.

**II.**

The parties have filed motions challenging the qualifications of the opposing party's expert witnesses and the reliability of the methodology used by those experts to reach their opinions. In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court held that district courts must initially assess the admissibility of "scientific" expert testimony under Fed. R. Evid. 702. The Supreme Court extended the gatekeeper role of federal district courts to all expert testimony in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). In Bitler v. A.O. Smith Corp., 400 F.3d 1227 (10th Cir. 2005), the Tenth Circuit discussed the role of district courts when considering a Daubert challenge to the admissibility of expert testimony. First, the court should

---

[2] Under the remaining claims, plaintiff seeks contribution from TCI under theories that TCI was a former owner of or arranger for the TMF Smelter (Counts III through VI), and plaintiff seeks a declaratory judgment that TCI should be required to pay, in full or in part, the costs of investigation and remediation for the Collinsville Town Site (Count VII).

3

make a preliminary finding that the expert is qualified to testify. Id. at 1232-33. Next, the proponent of expert testimony must establish that the expert used reliable methods to reach his/her conclusion and that the expert's opinion is based on a reliable factual basis. Id. at 1233. The Tenth Circuit cited four factors that district courts should apply to make a reliability determination:

> (1) whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has "general acceptance."

Id. at 1233 (citing Daubert, 509 U.S. at 593-94). The Tenth Circuit was clear that "a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." Id. In other cases, the Tenth Circuit has emphasized that any analytical gap in an expert's methodology can be a sufficient basis to exclude expert testimony under Daubert. Trucks Ins. Exchange v. MagneTek, Inc., 360 F.3d 1206, 1212-13 (10th Cir. 2004); Goebel v. Denver & Rio Grande Western R. Co., 346 F.3d 987, 992 (10th Cir. 2003). Under Daubert, "'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissable. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" Mitchell v. Gencorp Inc., 165 F.3d 778, 783 (10th Cir. 1999) (citing In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir. 1994)).

The Court notes that this case is set for a bench trial, but the Court must still consider whether expert testimony offered by the party is admissible. Gonzales v. Nat'l Bd. of Med. Examiners, 225 F.3d 620, 635 (6th Cir. 2000). However, a district court has the discretion to apply a more relaxed Daubert standard when expert testimony is offered at a bench trial. David E. Watson, P.C. v. United States, 668 F.3d 1008, 1015 (8th Cir. 2012). "Where the gatekeeper and the factfinder are one--that is, the judge--the need to make such decisions prior to hearing the testimony

is lessened." In re Salem, 465 F.3d 767, 777 (7th Cir. 2006). The Court also retains broad discretion to exclude expert testimony from a bench trial if it would not be helpful to the Court in its role as the finder of fact. See United States v. Kalymon, 541 F.3d 624, 636 (6th Cir. 2008).

The parties are also advised that all of the expert testimony at issue in the pending motions concerns what is ultimately a legal matter, and the issue of piercing the corporate veil will most likely be resolved on a motion for summary judgment. It will not be necessary for any party to offer expert testimony on the ultimate issue as to whether the corporate veil should be pierced, but the parties may offer expert testimony in the form of expert reports or affidavits concerning the relevant facts that will be considered when applying Kansas law. The Court will consider the parties' arguments concerning the admissibility of expert testimony under Daubert, but the arguments will be considered in the context of whether expert reports or affidavits would be helpful in resolving a motion for summary judgment. A bench trial will be set only if the Court is unable to resolve plaintiff's alter ego argument on a motion for summary judgment.

### III.

### A.

Plaintiff asks the Court to exclude the testimony of Jennifer Stevens, Ph.D, because she lacks the qualifications to offer testimony on legal or business matters and she did not apply a reliable methodology to reach her opinions. Dkt. # 124. Defendant responds that plaintiff has mischaracterized Dr. Stevens' proposed expert testimony, and Dr. Stevens will not be offering testimony on any matter of law or business. Instead, defendant argues that Dr. Stevens is a historian who will testify about facts concerning the ownership of TFMC that can be supported by the historical record. Dkt. # 130, at 8.

5

Dr. Stevens has a Ph.D. in American history from the University of California, and she is the principal researcher for Stevens Historical Research Associates. Dkt. # 124-1, at 24. Defendant retained Dr. Stevens as an expert and she was directed to perform the following tasks:

1. To research the history of [TFMC] and to conduct a thorough document and archival review of [TFMC] and [NJ Zinc] records;

2. To examine historical literature and other sources of information to identify business trends, norms, and practices during the time TFMC was in existence; and

3. To draw from [her] training and experience as a professional historian to develop factual findings and opinions regarding the relationship, if any, between TFMC and NJ Zinc.

Id. at 4. Dr. Stevens' research focused on the years when TFMC was in existence -- 1906 to 1926 -- and she was instructed by defense counsel to assume that TFMC was a subsidiary of NJ Zinc when preparing her report. Id. at 5 n.1. She identified each of the historical archives and databases that she examined in an attempt to locate relevant documents. Id. at 5-8. Dr. Stevens provided a brief history of the corporate structures used by businesses in the zinc industry during the relevant time period, and she stated that vertical integration was common in the zinc industry. Id. at 9. Her opinions are based on her training and experience as a historian, and she stated her opinions as to what conclusions about TFMC's ownership were supported by the documents or the absence of documents. However, she did not opine on any of the ultimate factual issues as to whether the corporate veil should be pierced. She stated that she had "seen no records demonstrating that [NJ Zinc] owned the smelter site" and that the list of shareholders for TFMC identified only individuals, rather than entities, as shareholders for TFMC. Id. at 11. She explained that other documents she reviewed did not show that NJ Zinc ever directly owned any stock of TFMC, and she found no

evidence that TFMC requested directions on daily operations or funding from NJ Zinc. Id. at 13-14, 16.

Plaintiff raises four objections to Dr. Stevens' testimony: (1) Dr. Stevens is unqualified to offer opinions as to the ownership of TFMC by individual shareholders; (2) Dr. Stevens has no business experience and she is not qualified to testify about TFMC's observance of corporate formalities; (3) there is an insufficient historical record to support Dr. Stevens' opinions concerning the degree of operational control exercised by NJ Zinc; and (4) Dr. Stevens is not an accountant and she lacks the expertise to testify about any financial relationship between TFMC and NJ Zinc. The Court has reviewed Dr. Stevens' report and none of her opinions can reasonably be viewed as conclusions of law or opinions that require special expertise about the zinc industry. The Court finds that Dr. Stevens' opinions do not require her to possess a law degree or any special business experience, because her opinions are simply intended to show what factual findings the historical record tends to support. Dr. Stevens' education and experience as a historian are well-suited to offering these types of opinions. For example, it not necessary for Dr. Stevens to have a law degree to review documents and determine that individuals, rather than entities, are listed as the shareholders of TFMC. This opinion is well within her expertise as a historian and her opinion is properly viewed as a recitation or summary of the historical documents she found. Dr. Stevens has also offered opinions as to TFMC's observance of corporate formalities, and her report states that she located annual statements, reports of annual meetings and elections, and reports filed with the Kansas Secretary of State. Dkt. # 124-1, at 16. She does not attempt to offer any opinion as to the ultimate legal conclusion that these formalities tend to suggest that TFMC was or was not the alter ego of NJ Zinc, and her summary of the historical documents is well within her expertise. Plaintiff's

7

objections on these points are not based on any alleged unreliability in Dr. Stevens' methodology, but are solely directed towards Dr. Stevens' qualifications to offer the opinions. The Court finds that plaintiff's objections as to Dr. Stevens qualifications to summarize documents showing TFMC's corporate ownership and observance of corporate formalities are overruled.

Plaintiff argues that Dr. Stevens' opinions about the degree of operational control over TFMC's operations exercised by NJ Zinc are unreliable, because the lack of historical documents to show such control is not unusual and the lack of these documents does not support a conclusion that NJ Zinc failed to exercise control over TFMC's operations. Dkt. # 124, at 15-18. Dr. Stevens opined that businesses in the relevant time period most commonly used telegrams to communicate, but she found no evidence of daily telegram communications between NJ Zinc and TFMC. Dkt. # 124-1. She found documents showing that persons visited the TFM Smelter, but she could not with any historical accuracy determine if these visits were conducted on behalf of NJ Zinc. Id. at 14. She also found no documents showing that TFMC requested operational support or permission to act from NJ Zinc. She does not conclusively opine that NJ Zinc did not exert any control over the operations, but she summarizes what the historical documents tend to show. If defendant offers these opinions in support of a motion for summary judgment, the Court will take the opinions at face value and consider whether the existence or absence of historical documents tends to support a particular conclusion. The Court will not infer only from the absence of certain documents that NJ Zinc did not exert operational control over NJ Zinc. The opinions offered by Dr. Stevens on this issue are within the expertise of a historian, and a plain reading of Dr. Stevens' report does not suggest that she is attempting to exceed her expertise.

Plaintiff's final objection to Dr. Stevens' expert report is that she lacks expertise in accounting and she should not be permitted to offer any opinion about the significance of financial documents. Dkt. # 124, at 18. Plaintiff objects to the following opinions offered by Dr. Stevens:

17. I saw no evidence that TFMC was unable to pay its debts or bills, or that [NJ Zinc] was paying the bills of TFMC.

18. The documents demonstrate TFMC paid their own employees' wages, including bonuses or "salary dividends." TFMC reserved for employee compensation expenses and federal income taxes. Additionally, the War Industries Board intervened on behalf of the company in order to prioritize TFMC employees in 1918.

19. I saw no evidence or documentation that [NJ Zinc] paid the wages of TFMC employees.

31. TFMC paid [NJ Zinc] to handle certain centralized operations that were created as part of this move toward efficiency, including administration, legal, pensions, prospecting and engineering. [NJ Zinc] charged TFMC a pro-rata share of 2.5% of these administrative costs. Some examples of representative shared services include: the March 16, 1926 submission of annual reports; requests for employees' exemptions during the War; and application to the Treasury Department for drawbacks on ore tariffs.

Dkt. # 124-1, at 14, 18-19. Each of these opinions is supported by a citation to the documents reviewed by Dr. Stevens in reaching the opinion. None of these opinions requires an expertise in accounting and Dr. Stevens is simply summarizing historical documents she found during her research. When the Court rules on the motion for summary judgment, the Court will consider the underlying documents themselves, rather than Dr. Stevens' opinions, to resolve the factual and legal issues in this case, but defendant may offer Dr. Stevens' opinions to the extent that it would be helpful to explain the existence or lack of documentation to support certain conclusions. The Court has reviewed plaintiff's motion (Dkt. # 124) and finds no reason to exclude any of Dr. Stevens' opinions under Daubert.

**B.**

Defendant seeks exclusion of the report and opinions of plaintiff's expert Bala Dharan, Ph.D., rebutting the testimony of defendant's accounting expert, Raymond F. Dovell, CPA, because Dr. Dharan relied on "non-accounting" evidence and reasoning to reach his conclusions. Dkt. # 126, at 11. Defendant claims that Dr. Dharan did not consider the financial evidence that an expert in the field of accounting would ordinarily find relevant or important, and his opinions fall outside of his expertise in accounting. Id. at 20.

Defendant retained Dovell, a certified public accountant, to analyze TFMC's annual reports for the years 1907 to 1925. Based on the annual reports, Dovell opined that TFMC's assets exceeded its liabilities and that TFMC was solvent under the balance sheet test. Dkt. # 126-5, at 4. He found evidence that TFMC's profits began to increase after an initial period of growth and expansion, and the profits were retained by TFMC. Id. at 5. Dovell stated that TFMC had sufficient capital to operate its business and it generated its own profits, and TFMC had almost no debt on its balance sheet by 1915. Id. at 6. TFMC had sufficient liquidity to pay its short term obligations out of its working capital, and it maintained significant cash balances after the TFM Smelter became operational. Id. at 9-10. He assumed that NJ Zinc treated TFMC as a subsidiary, but he stated that NJ Zinc did not receive any improper benefit from the operation of TFMC. Id. at 10-11.

Plaintiff retained Dr. Dharan to prepare an expert report rebutting Dovell's opinions. Dkt. # 131-1. Dr. Dharan is a certified public accountant with an M.S. and Ph.D in accounting. Id. He is currently serving as a visiting professor at Harvard Law School, and he is the vice president of Charles River Associates (CRA), an economic and business consulting firm. Id. Dr. Dharan disagreed with Dovell's analysis of TFMC's annual reports and he used other types of historical

documents to support his conclusions. Dr. Dharan stated that other evidence tended to support a finding that the profits recorded on TFMC's annual statements actually went to NJ Zinc through intercompany transactions. Dkt. # 131-1, at 5. He relied on documents and testimony presented to the Interstate Commerce Commission (ICC) in which NJ Zinc claimed to exercise the authority over its subsidiaries "in any and all matters." Id. at 9. He also considered statements by NJ Zinc executives in Zinc magazine in which the executives claimed that NJ Zinc subsidiaries were "interwoven" and that subsidiaries sold product to NJ Zinc at cost. Id. at 10. Dr. Dharan disputed Dovell's interpretation of the annual reports as to Dovell's opinion that TFMC retained its own profits and had sufficient liquidity to pay its short term obligations, and Dr. Dharan explained how the annual reports could support a conclusion that TFMC was being operated solely for the benefit of NJ Zinc. Id. at 15-16. Most of Dr. Dharan's opinions are supported solely by referencing the same annual reports cited by Dovell.

The Court has reviewed the expert reports of Dr. Dharan and Dovell and finds that the underlying evidence on which they rely to reach their opinions will be helpful to the Court when determining whether TFMC was the alter ego of NJ Zinc. The Kansas Supreme Court has identified eight factors for a court to consider when a party seeks to pierce the corporate veil:

> (1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud.

State ex rel. Graeber v. Marion County Landfill, Inc., 76 P.3d 1000, 1017 (Kan. 2003). The evidence reviewed by the accounting experts and any data they prepared may be helpful to the Court when applying these factors, such as the alleged undercapitalization of TFMC, the payment of

dividends, and the siphoning of funds by a dominant shareholder. Plaintiff acknowledges that Dr. Dharan used non-traditional accounting evidence and methodology when preparing his report, but it states that limited traditional accounting evidence was available due to gaps in the historical record. The parties do not dispute that there are gaps in the historical record, and both parties have had to rely on non-traditional sources in support of their arguments. The Court does not find that Dr. Dharan's testimony, or any expert's report or testimony in this case, should be excluded simply due to reliance on non-traditional sources to support some of his or her opinions. After reviewing Dr. Dharan's and Dovell's reports, it is clear that they both relied on TFMC's annual reports when reaching most of their opinions, and they reached substantially different opinions about TFMC's independence from NJ Zinc after reviewing the same documents. This suggests that expert accounting testimony could be helpful to the Court, because different experts have reviewed the documents and come to different conclusions. However, the differing opinions of the experts will not be a substantial factor in the Court's analysis, because the Court will review the underlying evidence and data and reach its own conclusions as to piercing the corporate veil under Kansas law. The parties may submit reports or affidavits from their accounting experts as part of the summary judgment briefing, but they are advised that the Court will independently review the underlying documents and data relied upon by the accounting experts. The experts' differing conclusions will be considered but will not be given substantial weight to the extent that the evidence speaks for itself. Defendant's motion to exclude Dr. Dharan's testimony (Dkt. # 126) should be denied.

## C.

Defendant asks the Court to exclude the testimony of plaintiff's expert James Burrows, Ph.D, because he offers opinions outside of his expertise as an economist and he did not use a reliable methodology to reach his opinions. Dkt. # 125. Plaintiff responds that defendant mischaracterize Dr. Burrow's expertise and he is qualified to testify about historical practices in the mining industry. Plaintiff also argues that Dr. Burrow's opinions are based on his review of the discovery materials and evidence found in his own research, and that he had a sufficient factual basis to testify about the economic relationship between TFMC and NJ Zinc.

Dr. Burrows is the vice chairman of CRA, and he has an A.B. in economics from Harvard University and a Ph.D in economics from the Massachusetts Institute of Technology. Dkt. # 133-1, at 2. Dr. Burrows now serves as the director of CRA's economic litigation practice, but he formerly managed CRA's metals and minerals practice division. Id. at 3. His academic and professional experience has been focused on the economic analysis of the metals and minerals markets, and his work often involves historical research going back to the 19th and early 20th centuries. Id. Plaintiff retained Dr. Burrows to "review[] and analyz[e] extensive historical materials, and provide expert opinions as to the nature of the relationship between [NJ Zinc] and [TFMC] and TFMC's zinc smelter in Collinsville, Oklahoma . . . ." Id. at 2. Dr. Burrows opined that strong economic incentives in the zinc industry existed during the early 20th century for vertical integration, and the evidence he reviewed showed that NJ Zinc exerted " an extraordinary degree of control over all important activities of TFMC . . ." Id. at 5. He stated that historical documents show that TFMC's shares were held by individuals "closely associated" with NJ Zinc, and NJ Zinc exerted "actual operational control" over TFMC. Id. at 10-11. Dr. Burrows discusses a proceeding before the ICC

in which NJ Zinc represented that it owned all of the stock of TFMC and that it completely controlled the operations of TFMC. Id. at 16-23. He also summarizes articles in Zinc magazine and government reports in which TFMC is identified as a subsidiary of NJ Zinc. Id. at 24-33. Dr. Burrows found evidence of the transfer of employees between NJ Zinc and TFMC and the inclusion of TFMC employees on NJ Zinc's pension plan, and he opined that these economic factors showed that NJ Zinc controlled the operations of TFMC. Id. at 34-37. He also stated that, based on his experience with the metals industry, TFMC was operated as a division or department of NJ Zinc. Id. at 39-41.

Defendant argues that Dr. Burrows' opinions fall outside of his expertise as an economist, and he lacks the qualifications to testify as a "forensic historian." Dkt. # 125, at 9. However, the mere fact that Dr. Burrows conducted historical research to reach his opinions does not mean that he was testifying outside of his expertise as an economist. Historical research is a part of a wide range of scholarship, and Dr. Burrows testified in his deposition that "economic history and a large part of what we do in economics is history, so I've been trained in the field of economics which involves analysis of economic history." Dkt. # 133-3, at 3. The Court finds that Dr. Burrows' references to historical documents and economic history is reasonable in this case. The parties dispute whether a corporation that was dissolved in 1926 was a subsidiary on NJ Zinc, and there is no dispute that the parties' experts must rely on historical documents to support their opinions. Under these circumstances, an expert in the field of economics could reasonably refer to economic history and historical documents to conduct an economic analysis of TFMC's corporate status.

Defendant also argues that Dr. Burrows did not use a reliable methodology, because many of his opinions are not supported by reference to specific documents and his opinions have no "fit"

or relevance to the issues before the Court. Dkt. # 125, at 13-21.[3]  The Court has reviewed Dr. Burrows' report and finds that he includes extensive citations to the documents upon which he relied to reach his opinions.  While each sentence or paragraph does not have a citation, it is clear to the reader to which documents Dr. Burrows is referring, and the Court finds that Dr. Burrows' opinions are well supported by reference to the discovery materials and other historical documents. To the extent that Dr. Burrows reviewed or summarized historical documents, the Court may consider his economic analysis as to certain historical facts to which his expertise could be helpful, but the Court will independently review the documents and reach its own conclusions as to the contents of the documents and the application of Kansas corporation law.  However, Dr. Burrows' expertise on economic matters could be helpful to the Court, and Dr. Burrows does display significant expertise on the historical practices of the metals industry in the early 20th century.  The Court finds that defendant's motion (Dkt. # 125) to exclude Dr. Burrows' testimony should be denied.

**D.**

Defendant seeks the exclude the testimony of Irwin Steinhorn, because his testimony would not assist the Court and would intrude upon the Court's role as the sole arbiter of the law.  Dkt. # 127.  Plaintiff responds that Steinhorn's testimony would not intrude upon the role of the Court and Steinhorn's expertise on matters of corporate governance would be helpful to the Court.

---

[3]   Defendant raises these arguments as separate grounds to exclude Dr. Burrows' testimony. The Court has reviewed defendant's motion (Dkt. # 125), and both arguments essentially raise the same argument that Dr. Burrows failed to support his opinions by reference to specific documents.  The Court also notes that this case will be resolved on a motion for summary judgment or at a bench trial, and the Court has the discretion to admit testimony and to disregard any expert opinions that are not relevant or helpful at a later time.  In re Salem, 465 F.3d at 777.

Steinhorn is a licensed attorney in Oklahoma, and he practices at a law firm in Oklahoma City, Oklahoma. Plaintiff retained Steinhorn as an expert, and he prepared a report stating "why, in [his] opinion, [NJ Zinc], a New Jersey corporation, acted as the alter ego of, and dominated and controlled all material aspects of [TFMC], a Kansas corporation, and TFMC's zinc smelter in Collinsville, Oklahoma." Dkt. # 132-1, at 2. Steinhorn states that he is attempting to offer a "corporate governance perspective" based on his experience as a "senior corporate officer and General Counsel of two publicly held corporations, more than 40 years experience as a corporate/securities law practitioner, and approximately 30 years teaching corporations, securities, and agency . . . ." Id. The report states that Steinhorn intends to testify as to the following opinions:

(a) NJ Zinc was the beneficial and equitable owner of all of TFMC's stock;

(b) NJ Zinc completely dominated and controlled TFMC;

(c) NJ Zinc's control over TFMC was so pervasive that NJ Zinc was effectively the operator of TFMC's smelter;

(d) NJ Zinc, TFMC, and other subsidiaries of NJ Zinc had numerous common officers, directors, employees, and shareholders of record;

(e) TFMC was not adequately capitalized;

(f) NJ Zinc was TFMC's sole customer and provided substantially all of TFMC's supplies of raw materials and other equipment;

(g) TFMC failed to follow normal corporate formalities;

(h) NJ Zinc siphoned funds, profits, and products from TFMC;

(i) TFMC was a facade for NJ Zinc's smelter operations in Oklahoma;

(j) TFMC did not act independently, it acted as an agent and alter ego of NJ Zinc, its principal; and

16

    (k)    To permit NJ Zinc to benefit yet again from the corporate form which it established, abused, and was the sole benefactor of throughout TFMC's corporate existence, would be an injustice.

Id. at 2-3. Steinhorn states that he reviewed the Kansas Corporation Code, Delaware corporation law, and decisions of Kansas appellate courts when reaching his opinions. Id. at 4-5. Much of Steinhorn's report consists of summaries of the discovery materials and Steinhorn's application of the discovery materials to the law. Steinhorn concluded that TFMC was controlled and dominated by NJ Zinc and that "in [his] opinion that to permit the corporate structure to be upheld would be unjust." Id. at 29.

    Under Fed. R. Evid. 702(a), expert testimony may be permitted if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." However, Rule 702 does not allow an expert witness to offer a legal conclusion. C.P. Interests, Inc. v. California Pools, Inc., 238 F.3d 690, 697 (5th Cir. 2001). "Courts have historically refused to admit expert testimony explaining matters of domestic law . . . ." Landmark Builders, Inc. v. Cottages of Anderson, LP, 2003 WL 21508118, *2 (S.D. Ind. May 20, 2003). When deciding whether to admit the testimony of an attorney expert, the Tenth Circuit has clearly stated that testimony on questions of law is disfavored, but an attorney may testify on issues of fact if it would be helpful to the trier of fact. Specht v. Jensen, 853 F.2d 805, 808 (10th Cir. 1988). In a bench trial, attorney expert testimony could be admissible if the proposed testimony could assist the Court on a factual issue. Perez ex rel. Cardenas v. Henneberry, 2011 WL 1743734, *3 (D. Colo. May 7, 2011). In a bench trial, expert testimony on the law is properly excluded if it would not be helpful to the court and the same arguments could be made by counsel. Sparton Corp. v. United States, 77 Fed. Cl. 1, 9 (Fed. Cl. 2007).

Plaintiff argues that Steinhorn will not be relying on his expertise as an attorney and he will not be offering legal conclusions but, instead, Steinhorn will be relying on his experience as a "corporate management executive and scholar" to testify about practices of corporate governance. Dkt. # 132, at 9-11. Steinhorn's report states that he was senior vice president and general counsel for LSB Industries, Inc., a diversified industrial company, from 1971 to 1986, and he was vice president and general counsel for USPCI, Inc., a hazardous waste management company, from 1986 to 1988. Dkt. # 132-1, at 31. Steinhorn does not claim to have any particular expertise in corporate practices for the mining industry nor is he an expert in corporate practices in the early 20th century. In his deposition, Steinhorn stated that he "[r]elied upon the documents that were provided in analyzing those documents and came to a conclusion and an opinion," but he denied that his opinions were informed by his experience as a lawyer. Dkt. # 127-1, at 19. The Court has fully reviewed Steinhorn's report, and each of his opinions goes to the factors for piercing the corporate veil under Kansas law and he expressly states conclusions as to how the Court should resolve those factors. He also concludes his report by stating "NJ Zinc is liable for the debts and obligations of TFMC." Id. at 30.

Although plaintiff argues that Steinhorn is not attempting to offer legal conclusions, a plain reading of Steinhorn's report shows that he opines on matters of law that must be resolved by the Court. In this case, the Court will decide all issues of law and fact, because no party has demanded a jury. Attorney testimony is permitted in particularly complex cases, such as trademark cases, when the expertise of a practitioner in a specialized area of the law could be helpful to the trier of fact. Int'l Market Brands v. Martin Int'l Corp., 882 F. Supp. 2d 809 (W.D. Pa. 2012). The legal issues in this case are not novel or complex, and Kansas law on the issue of piercing the corporate

veil is clearly established. Plaintiff claims that Steinhorn will testify based on his experience as a corporate officer, rather than on matters of law, but Steinhorn's report speaks for itself and he plainly states conclusions of law. To the extent that Steinhorn's opinions go to matters of corporate governance, plaintiff has not shown that the issues in this case are particularly complex or that expert testimony on these matters would be helpful to the Court. Plaintiff may rely on the documents reviewed by Steinhorn in support of its arguments, but Steinhorn's report or opinions will not assist the Court in resolving any factual issue. Defendant's motion to exclude Steinhorn's testimony (Dkt. # 127) should be granted.

## IV.

After reviewing the parties' <u>Daubert</u> motions, it appears clear that sole issue in dispute is whether TFMC's corporate status should be disregarded under Kansas law. Although the parties have retained expert witnesses, much of the proposed expert testimony would consist of summarizing documents in the record, and it is not clear that expert testimony will be necessary to resolve what is a fairly straightforward legal issue. The parties are directed to submit motions for summary judgment on the issue of piercing the corporate veil under Kansas law. The parties may submit expert reports or affidavits (except from Steinhorn) in support of their motions for summary judgment, but they shall submit also with their motions for summary judgment any documents reviewed by their experts and the Court will independently review the documents. The parties appear to have a firm grasp of the record and the issues, and the Court finds that 60 days should be a sufficient amount of time for the parties to submit their motions for summary judgment.

**IT IS THEREFORE ORDERED** that Plaintiff Cyprus Amax Minerals Company's Daubert Motion to Exclude Opinions of Defendants' Experts Jennifer Stevens, Ph.D. and Brief in Support (Dkt. # 124) is **denied**. Defendants' Motion to Exclude Testimony of James Burrows and Integrated Brief in Support (Dkt. # 125) is **denied**. Defendants' Motion to Exclude Testimony of Bala Dharan and Integrated Brief in Support (Dkt. # 126) is **denied**. Defendants' Motion to Exclude Testimony of Irwin Steinhorn and Integrated Brief in Support (Dkt. # 127) is **granted**.

**IT IS FURTHER ORDERED** that the parties' motions for summary judgment on the issue of TFMC's and NJ Zinc's corporate relationship, including any arguments as to piercing the corporate veil, are due no later that **April 21, 2014**. Response and replies are due pursuant to LCvR 7.2.

**IT IS FURTHER ORDERED** that this matter will be set for a settlement conference before the summary judgment briefing is completed.

**DATED** this 21st day of February, 2014.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE