# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

CYPRUS AMAX MINERALS COMPANY,   )
            )
     **Plaintiff,**   )
            )
v.            )     **Case No. 11-CV-0252-CVE-PJC**
            )
TCI PACIFIC COMMUNICATIONS, INC.,   )
            )
     **Defendant.**   )

## OPINION AND ORDER

Now before the Court are Plaintiff Cyprus Amax Mineral Company's Motion for Partial Summary Judgment and Integrated Brief in Support (Dkt. # 151) and Defendant's Motion for Summary Judgment and Integrated Memorandum in Support (Dkt. # 161). Plaintiff Cyprus Amax Mineral Company (Cyprus) filed this case seeking contribution under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (CERCLA), from defendant TCI Pacific Communications, Inc. (TCI). Cyprus alleges that TCI is the successor-in-interest to New Jersey Zinc Company (NJZ), and that Tulsa Fuel and Management Company (TFMC) was a subsidiary of NJZ. Cyprus claims that TCI is liable for environmental harm caused by TFMC's operations in Collinsville, Oklahoma, because TFMC was the alter ego of NJZ, and TCI has assumed responsibility for the liabilities of NJZ. The parties have filed cross-motions for summary judgment on the issue of the whether TFMC was operating as the alter ego of NJZ. Cyprus also argues that TCI is liable for contribution under a theory that NJZ directly managed TFMC's operations in Collinsville.[1]

---

[1] In a prior opinion and order (Dkt. # 145), the Court directed the parties to file motions for summary judgment as to the "corporate relationship" between TFMC and NJZ, but the Court did not request briefing on the ultimate issue of TCI's liability under CERCLA. This Opinion and Order is limited to the issue of whether TFMC was the alter ego of NJZ, and any issues going to TCI's liability under CERCLA will not be addressed in this Opinion and Order.

# I.

In 1906, TFMC was incorporated under the laws of Kansas, and the incorporators identified in TFMC's application for a corporate charter were L.T. McRae, C.A.H. de Saulles, J.T. Price, A.D. Terrell, and G.C. Stebbins. Dkt. # 162, at 1-4. McCrae and de Saulles were officers or employees of Prime Western Spelter Company (Prime Western), and NJZ had acquired Prime Western in 1902. Dkt. # 170-1, at 16-17. TFMC's application for a corporate charter states that TFMC would have $50,000 in startup capital. Dkt. # 162, at 3. The historical record of TFMC's corporate activities is not complete, but TCI has produced evidence that TFMC held a shareholder's meeting in 1912. Id. at 29-31. TFMC filed an annual statement with the state of Kansas every year from 1907 to 1925. Id. at 37-107. Some of the documents produced by the parties are old and the copies are difficult to read, but it is clear that at least some of TFMC's annual statements were signed and notarized in the state of New York.[2] The annual statements show that TFMC elected corporate officers and had a board of directors, and the annual statements represented that individuals, rather than NJZ, were the actual shareholders of TFMC's stock. TFMC had a registered agent to accept service of process. Id. at 108-10.

Certain corporate officers of NJZ, including NJZ's president Edgar Palmer, held the same position with TFMC during much TFMC's existence. Id. at 118-19; Dkt. # 170-4, at 19. In 1912, de Saulles sold real property to TFMC for $1.00. Dkt. # 163, at 52. When the transaction took place, de Saulles was president of TFMC, and he owned 495 of the 500 shares issued by TFMC. Id. at 57. The deeds for TFMC's real property do not mention NJZ, but de Saulles was the general

---

[2]     Cyprus asks the Court to infer that the annual statements were prepared by NJZ at its corporate offices in New York. Dkt. # 170, at 7-8.

manager and assistant superintendent of Prime Western before he became president of TFMC in 1908.[3] Dkt. # 170-1, at 17. By 1922, the NJZ president, vice president, general counsel, comptroller, treasurer, general sales manager of ore, and purchasing agent held the same positions with TFMC. Dkt. # 153-1, at 3, 5.

The historical record of TFMC's financial condition is somewhat limited, but TFMC's annual statements filed with the state of Kansas do provide some evidence of TFMC's finances. The annual statements show that TFMC was indebted up to $586,226 until 1914, but there was no indebtedness listed on the annual statements from 1915 to TFMC's dissolution in 1926. Dkt. # 162, at 38-76; Dkt. # 163, at 1-33. The annual statements do not identify the source of the loans or if the loans were repaid, and the parties dispute what the loans listed on the annual statements actually represent. Cyprus' accounting expert, Bala Dharan, Ph.D., CPA, opines that the loans were intercompany transfers from NJZ, because he believes that TFMC lacked the operating history or assets to independently borrow the amounts listed in its annual statements. Dkt. # 170-1, at 112. TCI's accounting expert, Raymond Dovell, CPA, concludes that TFMC borrowed money to fund the construction of its smelting plant and that the loans were repaid by 1915.[4] Dkt. # 161-2, at 15. The parties' experts also dispute whether TFMC was solvent during it existence or to what extent

---

[3]     De Saulles was the president of TFMC from 1908 to 1912. Dkt. # 170-1, at 17. Palmer served as TFMC's president for the remainder of TFMC's existence. Dkt. # 162, at 38-76; Dkt. # 163, at 1-33.

[4]     Both parties complain that the opposing expert's testimony on financial matters is unreliable due to the lack of financial documentation supporting the opposing expert's opinions, but they do agree that there is no evidence other than the annual statements to document the financial condition of TFMC. Both accounting experts make inferences to interpret the information in the annual statements, but there is no evidence in the record to show how TFMC's finances were managed on a day-to-day basis.

NJZ may have provided financial support for TFMC operations. Dkt. # 161-2, at 17-18; Dkt. # 170-1, at 113-19. According to the annual statements, TFMC generated a profit each year it was in existence, but the operating capital was never increased from $50,000.

As to TFMC's operations, there is no dispute that TFMC was incorporated in 1906 and that TFMC began conducting smelting operations in Collinsville in 1912. Dkt. # 164, at 7-8. However, the parties do dispute the extent to which NJZ and its officers were involved with the day-to-day operations of TFMC. TCI states that there is evidence that NJZ officers or directors visited the smelting plant in Collinsville a total of four times between 1912 and 1926. Dkt. # 164, at 9-11. However, in proceedings before the Interstate Commerce Commission (ICC),[5] NJZ represented that it "in fact and constant practice manages and directs the operations of its subsidiaries companies, including [TFMC], without regard to corporate lines of separation, and constantly exercises its authority to act for and in behalf of its subsidiaries in any all matters." Dkt. # 171, at 93. TFMC

---

[5] TCI objects to the admissibility of statements made during the ICC proceedings, because TCI was not a party to the ICC proceedings and there is no evidence showing that the statements were made on behalf of TCI. Dkt. # 174. However, courts have found that the statements of a predecessor-in-interest are admissible under the residual exception to the hearsay rule, even if the statements do not constitute a party admission under Fed. R. Evid. 801(d)(2). Cynergy, LLC v. First American Title Ins. Co., 706 F.3d 1321, 1329-30 (11th Cir. 2013). Under Fed. R. Evid. 807, a hearsay statement that would otherwise be excluded is admissible if "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice." The sworn statements of a witness under oath at an administrative hearing carry significant guarantees of trustworthiness, and the statements were offered by NJZ and/or TFMC as probative of a material fact. Given the passage of time, there is little other evidence available on which Cyprus could rely and Cyprus has made reasonable efforts to locate evidence. The Court also finds that admission of statements made during the ICC proceedings is consistent with the hearsay rules and would be in the best interests of justice. The Court finds that statements made by representatives of NJZ during the ICC proceedings are admissible under the residual exception to the hearsay rule.

was dissolved in 1926 and sold its real property to Tulsa County Coal Company.  Id. at 56.  Upon dissolution, NJ Zinc received a $500,000 dividend from TFMC.  Dkt. # 171, at 156.

During its existence, TFMC was involved in court proceedings on its own behalf and sometimes with assistance from NJZ.  TFMC designated an agent for service of process in Indian Territory.  Dkt. # 164, at 15.  TFMC was named as a party in at least two lawsuits in Oklahoma courts.  Id. at 18-41; Dkt. # 165, at 1-30; Dkt. # 166, at 1-28.  TFMC defended itself in its own name and NJZ was not a party to the cases.

TFMC was also involved in a dispute before the ICC concerning freight charges for the shipment of zinc concentrates.  On April 8, 1922, TFMC filed a complaint alleging that it was charged excessive freight charges for the transportation of zinc concentrates.  Dkt. # 167, at 39-41.  The ICC held an administrative hearing on January 11, 1923, on the issue of whether TFMC paid excessive freight charges in March 1918 for the shipment of zinc concentrates from Minnequa, Colorado to Collinsville.  Dkt. # 171, at 10.  The issue was first raised by NJZ when it sent a letter to Cyrus Stafford of the United States Railroad Administration, and Stafford advised NJZ to file a claim with the ICC to toll the statute of limitations.  Id. at 19-20.  NJZ filed an informal complaint with the ICC on January 8, 1921, and the claim was amended on February 5, 1921.  Id. at 20.  NJZ conducted informal negotiations with the ICC in an attempt to resolve the claim, but the ICC advised NJZ that a formal complaint would have to be filed.  Id. at 27.  The formal complaint was filed by TFMC, rather than NJZ, and an issue arose as to whether TFMC's complaint was barred by the statute of limitations.  At the January 11, 1923 administrative hearing, TFMC represented that it was a subsidiary of NJZ and that its entire stock was owned by NJZ.  Id. at 28-29.  TFMC further stated that NJZ "completely owns" TFMC.  Id. at 31.

On May 9, 1923, a second administrative hearing was held "simply for the purpose of receiving further proof respecting the circumstances surrounding the filing of the informal complaint staying the running of the statute of limitations." Id. at 82. NJZ sought to substitute TFMC as the complainant in NJZ's informal complaint and to deem the filing of the informal complaint as the date of filing to trigger the statute of limitations. Id. at 83-84. NJZ called C.H. George, the general traffic manager of NJZ and all of its subsidiary companies, to testify at the hearing. Id. at 85. George testified that he had the authority to act on behalf of NJZ and all of NJZ's subsidiaries, including TFMC. Id. at 86. George also read a prepared statement into the record. George stated that the "entire capital stock [of TFMC] is owned by [NJZ]" and that NJZ owns the stock of all of its subsidiary companies. Id. at 86-87. According to George, NJZ "possesses consequent to that absolute ownership, complete control of all the affairs of its subsidiaries . . . and in fact and in actual practice does exercise complete control in the general conduct of its and their business, and it acts as agent for and in behalf of its subsidiaries." Id. at 87. NJZ presented organizational charts showing the overall structure of NJZ and its subsidiaries, and George stated that the "lines of authority of [NJZ's] personnel extend to all companies, so that its executives and their staff function without regard to corporate lines of division." Id. at 88. The organization chart for NJZ's manufacturing department shows that TFMC was considered part of NJZ's manufacturing department. Dkt. # 170-4, at 18. George's written statement was summarized by four key points:

> (1) That [NJZ] in fact and in constant practice manages and directs the operations of its subsidiary companies, including [TFMC], without regard to corporate lines of separation, and constantly exercises its authority to act for and in behalf of its subsidiaries in any and all matters.

(2) That the lines of authority and responsibility of the officers of [NJZ] and their staff members extend to all subsidiary companies.

(3) That in January, 1921, as now, I was general traffic manager of [NJZ], and also of [TFMC].

(4) And, that, therefore, I was authorized to act for and in behalf of [TFMC] not only in my capacitiy of General traffic manager of [TFMC], but, also as general traffic manager of [NJZ] through the authority of the latter to act for the former.

Id. at 93-94. NJZ did not take the position that it authorized George to act on behalf of TFMC for the specific transaction at issue but, instead, NJZ argued that it generally had the authority to act on behalf of its subsidiaries in all matters. Id. at 98. In supplemental briefing to the ICC, NJZ reiterated its argument that it "owns all the capital stock of its subsidiary companies . . . and, consequent to such absolute ownership, possesses complete control of all the affairs of its subsidiaries, and in fact and in actual practice does exercise such complete control in the general conduct of its and their business, and it acts as agent for and in behalf of its subsidiaries." Dkt. # 153-1, at 36. NJZ further explained that many of its officers occupy the same positions for NJZ and its subsidiaries and that its officers often acted on behalf of NJZ's subsidiaries. Id. NJZ also directed the ICC to the organizational charts presented at the May 9, 1923 hearing and stated that its use of the word "'company' whenever used shall be understood to include all allied companies." Id. at 37.

The ICC issued a written decision in favor of TFMC on its claim of excessive freight charges. Dkt. # 167, at 42-43. The ICC stated that the complaint was filed by NJZ on behalf of TFMC and that NJZ "owns all the capital stock of complainant." Id. at 42. The ICC found that George had authority to file a claim on behalf of TFMC due to his dual role as general traffic

manager for NJZ and TFMC, and the ICC awarded TFMC reparation in the amount of $2,234.97 plus interest.  <u>Id.</u> at 43.

Cyprus has submitted additional evidence of statements by officers of NJZ while TFMC was still a going concern to support the argument that NJZ and its subsidiaries acted as a single entity. In an issue of Zinc magazine from 1918, NJZ vice president J.E. Hayes explained the overall structure of the company and he described the subsidiaries as part of a larger entity functioning under a single management system.  Dkt. # 174-3, at 170-172.  Hayes stated that it was often necessary for NJZ to form subsidiaries to operate in certain states, but the "the parent company and its lines of organization and routines carry through all the subsidiaries."  <u>Id.</u> at 173.  The parts of the organization further down the chain of command were encouraged "to the limit as long as your activity is related to zinc . . . ", and Hayes described higher levels of the corporate structure as responsible for serving as a "counselor and guide" and a "controller of excess enthusiasm and a spur to greater activity."  <u>Id.</u>   In a January 1918 NJZ "War Work" report to the Federal Trade Commission (FTC), NJZ stated that "all material is charged at cost as it passes into the next department" and, in reference to a subsidiary identified as New Jersey Zinc Co. (of Pa.), NJZ was responsible for keeping an inventory of the subsidiary's product and any profits from the sale of a finished product was credited to NJZ.  Dkt. # 153-2, at 34.  NJZ's president, Palmer, submitted an affidavit to the War Industries Board in an attempt to convince the Board that NJZ's operations were essential wartime activities.  Dkt. # 153-3, at 14-15.  Palmer stated that "[a]s the owner of the stock of its subsidiary companies it controls their operations, the purchase of all materials and the sale of all products."  <u>Id.</u> at 15.  TFMC is specifically identified as a wholly-owned subsidiary of NJZ.  <u>Id.</u>

The affidavit was apparently drafted in 1918, but the copy of the affidavit offered by Cyprus was not signed or dated by Palmer.[6]

Cyprus alleges that it is the successor-in-interest to the entity that owned the Bartlesville Zinc Smelter (BZ Smelter), and it states that the BZ Smelter is approximately a quarter mile from the Tulsa Fuel and Manufacturing Zinc Smelter (TFM Smelter) that formerly operated in Collinsville. Cyprus claims that it is cooperating with the Environmental Protection Agency (EPA) and the Oklahoma Department of Environmental Equality (ODEQ) in the cleanup of environmental contamination caused by zinc smelting. Dkt. # 2, at 5. Cyrpus entered a consent decree with the EPA and ODEQ providing for soil sampling and remediation near Collinsville. Id. at 6. Pursuant to the consent decree, Cyprus also agreed to undertake "comprehensive and costly response actions" and Cyrpus states that it has "incurred and will continue to incur cleanup and response costs, including reimbursement to ODEQ for investigative and response costs." Id. at 18.

On April 26, 2011, Cyprus filed this case alleging that NJZ was the parent company of TFMC and, under an alter ego theory, that NJZ was responsible for the debts and liabilities of TFMC. TFMC and NJZ are no longer in existence, but Cyprus claims that TCI, Viacom, CBS Corporation, and CBS Operations, Inc. are the successors-in-interest of NJZ. TCI has admitted that it is the successor-in-interest to NJZ. Dkt. # 143, at 1. Cyprus voluntarily dismissed defendants Viacom and CBS Corporation. Dkt. ## 59, 63. The remaining defendants, TCI and CBS Operations, Inc., filed a motion (Dkt. # 53) for a ruling as to whether Kansas or Oklahoma law applied to the issue of piercing the corporate veil under an alter ego theory. The judge then assigned

---

[6]    The parties dispute the admissibility of the affidavit because it is unsigned. For the purpose of this Opinion and Order, the Court will not consider Palmer's unsigned affidavit in ruling on the pending motions for summary judgment.

to the case, the Honorable Gregory K. Frizzell, found that Kansas law applied to this case, because laws of the state of incorporation ordinarily governed the disputed issue and TFMC was incorporated in Kansas. Dkt. # 89. The case was reassigned to the Honorable John E. Dowdell. Dkt. # 105. TCI and CBS Operations, Inc. filed a motion to dismiss (Dkt. # 114) Cyprus' claims for failure to state a claim upon which relief can be granted. The motion to dismiss was granted in part and denied in part. Dkt. # 142. All pending claims against CBS Operations, Inc. were dismissed with prejudice, and the unjust enrichment claim and certain of Cyprus' CERCLA claims were dismissed as to TCI. However, Counts III through VII of the amended complaint remain pending against TCI. Neither Cyprus nor TCI has demanded a jury trial on any issue. The case was randomly reassigned to the undersigned following the recusal of Judge Dowdell. Dkt. # 144. Before Judge Dowdell had ruled on the motion to dismiss, Cyprus and TCI had filed motions to exclude expert testimony, and those motions were pending when the case was reassigned to the undersigned. The Court entered an opinion and order (Dkt. # 145) excluding the testimony of Cyprus' proposed expert on the law, but the Court denied the remaining Daubert motions. The Court directed the parties to submit motions for summary judgment "on the issue of TFMC's and [NJZ's] corporate relationship, including any arguments as to piercing the corporate veil . . . ." Dkt. # 145, at 20.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

TCI argues that NJZ did not own the stock of TFMC, that NJZ did not use its subsidiary to perpetrate a fraud or injustice on any person, and that piercing the corporate veil is not permitted under Kansas law. Dkt. # 161, at 18-23. TCI also argues that Kansas courts apply a ten factor test to determine if a subsidiary corporation is being treated as a mere instrumentality of a parent corporation, and application of the ten factor test does not support piercing the corporate veil. Id.

at 24.  Cyprus responds no single factor should be considered dispositive on the issue of piercing the corporate veil, but that consideration of all of the factors shows that TFMC was the alter ego of NJZ.

Although TCI did not directly own or operate the TFM Smelter, the United States Supreme Court has established that parent corporations and their corporate successors can be held liable under CERCLA for the actions of a subsidiary corporation.  In <u>United States v. Bestfoods</u>, 524 U.S. 51 (1998), the Court ruled that a corporate parent can be directly liable for operating a polluting facility or it can be indirectly liable for the acts of the subsidiary in situations when piercing the corporate veil is appropriate.  <u>Id.</u> at 64-67.  As to indirect liability, CERCLA does not replace or supersede state corporation law, and piercing the corporate veil is decided under state law.  <u>Id.</u> at 62-63.  As stated, law of the case is that Kansas law applies.  Dkt. # 89.

Kansas follows the general rule that parent and subsidiary corporations are separate and distinct entities and, "[i]n the absence of fraud or other invidious and vitiating circumstances, the fact that one corporation is instrumental in the formation of another corporation and owns nearly all of the stock of the latter corporation does not have the legal effect of making the parent corporation liable for the debts of the subsidiary corporation."  <u>Dean Operations, Inc. v. One Seventy Associates</u>, 896 P.2d 1012, 1016 (Kan. 1995).  The mere fact that a parent corporation creates a subsidiary corporation to avoid liability is not sufficient to disregard the corporate entity of the subsidiary corporation.  <u>Id.</u> at 1016.  The Supreme Court of Kansas has identified ten factors that should be considered when a court is asked to disregard the corporate separateness of a subsidiary corporation:

> (1) the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) the corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribed to all of the capital stock of the subsidiary or otherwise caused its incorporation; (5) the

subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as a department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and (10) the formal legal requirements of the subsidiary as a separate and independent corporations are not observed.

Doughty v. CSX Transp., Inc., 905 P.2d 106, 111 (Kan. 1995). No single factor or combination of factors is determinative, and a court must consider on a case-by-case basis whether "there is such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for the principal." Moorhouse v. City of Wichita, 913 P.2d 172, 181 (Kan. 1996).

TCI disputes that NJZ was an owner or shareholder of TFMC because the evidence shows that the shares of TFMC were owned by individuals, and TCI argues that piercing the corporate veil is prohibited as a matter of Kansas law if NJZ did not own the stock in its subsidiary. TCI cites two decisions from the federal district courts in Kansas to support this argument. See Cotracom Commodity Trading AG v. Seaboard Corp., 94 F. Supp. 2d 1189 (D. Kan. 2000); Schmid v. Roehm Gmbh, 544 F. Supp. 272 (D. Kan. 1982). Cyprus responds that stock ownership is just one of the factors used to determine if the corporate entity should be disregarded and that many courts have found piercing the corporate veil appropriate in the absence of stock ownership by a parent company. Dkt. # 170, at 15-17. Doughty lists stock ownership as one of the non-exclusive factors used to determine if a corporate entity should be disregarded, and there are no cases from Kansas appellate courts standing for the proposition that stock ownership is a mandatory prerequisite for piercing the corporate veil of a subsidiary corporation. Cotracom Commodity Trading does not

support TCI's argument that stock ownership is absolutely required to pierce the corporate veil, but it simply stands for the proposition that the absence of stock ownership is one factor weighing against piercing the corporate veil. Cotracom Commodity Trading, 94 F. Supp. 2d at 1198-99. Schmid was decided well before Doughty and Dean, and the Supreme Court of Kansas stated in Dean that there was very little Kansas law on the issue of piercing the corporate veil of a subsidiary to reach the assets of a parent corporation. Dean, 896 P. 2d at 1016. Dean also specifically cited Schmid for the proposition that presence of some of the ten factors does not mandate a ruling in favor of the party seeking to pierce the corporate veil, but Schmid was not cited to support a rule that stock ownership is absolutely required before the corporate veil can be pierced. Dean, 896 P.2d at 1017-18. The Court rejects TCI's argument that stock ownership is an absolute requirement for piercing the corporate veil as a matter of Kansas law. Even if TCI were correct, there is sufficient evidence in the summary judgment record that NJZ held itself out as the owner of TFMC's stock. Dkt. # 171, 28-29 ("the entire stock is owned by [NJZ]"); id. at 31 (NJZ represented to the ICC that it "completely owns" TFMC); id. at 86-87 (George told the ICC that the "entire capital stock [of TFMC] is owned by [NJZ]). This is clear evidence that NJZ asserted its complete ownership of the stock of TFMC during the relevant time period, and the fact that the stock of TFMC was nominally owned by individuals associated with NJZ does not prevent the Court from considering whether the corporate veil of TFMC should be pierced.

TCI argues that there is no evidence that NJZ abused the corporate form for the purpose of effecting fraud or injustice on Cyprus, and that this prohibits the Court from even reaching the ten factor test for piercing the corporate veil. Kansas law is clear that the ultimate purpose of piercing the corporate veil is to prevent fraud or injustice. See Commerce Bank, N.A. v. Liebau-Woodall &

Associates, L.P., 20 P.3d 88, 93 (Kan. App. 2001) ("The veil piercing concept is to be used solely to avoid potential injury to third parties by perpetuating fraud, illegality, or injustice worked through the legal fiction of a corporate identity") ; Doughty, 905 P.2d at 111 ("The ultimate test for imposing alter ego status is whether, from all of the facts and circumstances, it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and the assets of the two are so mingled that recognition of the subsidiary as a distinct entity would result in an injustice or fraud to third parties."). The Tenth Circuit, applying Oklahoma law, has stated that the mere inconvenience of enforcing a judgment against a subsidiary is not a sufficient reason to pierce the corporate veil. Luckett v. Bethlehem Steel Corp., 618 F.2d 1373, 1379 (10th Cir. 1980). However, the Tenth Circuit, applying Kansas law, has also stated that many cases concerning piercing the corporate veil "have involved fraud or a more blatant commingling . . . but proof of fraud is not a necessary element in finding alter ego." Milgo Elec. Corp. v. United Business Communications, Inc., 623 F.2d 645, 662 (10th Cir. 1980). The Court has found no Kansas or Tenth Circuit cases where a court has simply declined to consider other factors, such as the Doughty factors, on the ground that the party seeking to pierce the corporate veil had not produced direct evidence that a subsidiary was created for the express purpose of perpetrating fraud or injustice. The Court finds that the Doughty factors should be considered even though Cyprus has not produced direct evidence that NJZ used the corporate form to commit a fraud or injustice against Cyprus.[7]

---

[7]     The Court notes that it would be a fraud or injustice to third parties for NJZ to affirmatively represent to the ICC that TFMC was effectively a department of NJZ for the purpose of recovering from a third party, while TCI attempts to argue in this case that NJZ and TFMC were entirely separate corporations in an effort to avoid liability under CERCLA.

Stock Ownership/Parent Caused Incorporation

Historical records show that at all times between 1906 and 1926 the stock of TFMC was owned by individuals, and there is no evidence showing that NJZ directly owned any stock of TFMC. Dkt. # 162, at 30-76; Dkt. # 162-1, at 31. There are no records expressly showing that any of the shareholders of TFMC held the stock for the benefit of NJZ, and TCI argues that this is significant evidence that TFMC was not the alter ego of NJZ. However, the fact that individuals, rather than NJZ, nominally owned TFMC's stock should be considered in light of the identity of those individuals. Cyprus' historical expert, James C. Burrows, Ph.D., points out that in 1912 certain individuals owned the stock of TFMC, but each of those individuals had a strong connection to NJZ. In particular, Edgar Palmer owned the vast majority of TFMC's stock and he was the president and chairman of the board of NJZ in 1912. Dkt. # 151-2, at 18. The rest of TFMC's stock was held by vice presidents, members of the board, and officers of NJZ. Palmer was the majority stockowner of TFMC from at least 1912 to 1926, and he was also a member of the board of TFMC during that time. In 1922, George represented to the ICC that the "entire capital stock [of TFMC] is owned by [NJZ]." Dkt. # 151-2, at 228. George added that NJZ "possesse[d], consequent to that absolute ownership, complete control of all the affairs of its subsidiaries . . . ." Id. at 229. The ICC relied on George's representations and made a specific finding that NJZ "owns all of the capital stock of [TFMC]." Dkt. # 167, at 42. Cyprus also points out that upon the dissolution of TFMC a dividend of $500,000 was paid to NJZ, not the individual shareholders, and this suggests that the true owner of TFMC was NJZ. Dkt. # 159-6, at 38.

While there is no dispute that NJZ did not directly own the stock of TFMC, there is significant evidence showing that persons closely associated with NJZ owned TFMC's stock and

that NJZ held itself out as the owner of TFMC's stock. TCI argues that NJZ could not be deemed the "equitable owner" of TFMC's stock as a matter of Kansas law, but the Court does not find that it is necessary to make that determination. See Dkt. # 174, at 21. Instead, the Court can rely on the statements of George as evidence that NJZ claimed to own the stock of TFMC, even if the nominal owners were individuals employed by NJZ, because this is strong evidence that NJZ claimed ownership and control over TFMC. The Court also finds that it is relevant that, upon its dissolution, TFMC paid a dividend directly to NJZ instead of the individual shareholders.[8] Even though there is no evidence that NJZ directly owned TFMC's stock, the Court will rely on NJZ's affirmative representations and the ICC's finding as evidence that NJZ owned or controlled the stock of TFMC.

Common Officers

The parties agree that NJZ and TFMC employed common officers and directors. Dkt. # 151, at 29; Dkt. # 161, at 26. For example, evidence submitted to the ICC in 1922 showed that the same persons held the positions of president, vice president, general counsel, comptroller, treasurer, general sales manager of ore, and purchasing agent for NJZ and TFMC. Dkt. # 153-1, at 3, 5. Although the parties do not dispute that there were common officers or directors, they disagree as to what weight this factor should be given. TCI's primary argument is that it would be inappropriate to pierce the corporate veil based only on the commonality of officers or directors between a parent and subsidiary company. Dkt. # 161, at 26. The Court agrees that this is not a dispositive factor under Kansas law. See Doughty, 905 P.2d at 114; Nelson v. A.O. Smith Harverstore Prods., Inc.,

_____

[8] TCI argues that TFMC's equity substantially exceeded $500,000 at the time of its dissolution. Dkt. # 174, at 24. TCI speculates that the additional equity could have been paid to TFMC's shareholders or that TFMC was investing $500,000 in NJZ. Both of these arguments are speculative and not supported by evidence in the summary judgment record, and the Court will not consider these arguments.

1990 WL 252135, *4 (D. Kan. 1990). However, that does not mean that this factor is irrelevant or entitled to little weight, as TCI suggests, when it is considered in the context of other evidence tending to show that a parent company controls or dominates a subsidiary. In this case, Cyprus has submitted evidence that gives this factor additional weight. In the ICC proceedings, NJZ expressly relied on the commonality of officers between NJZ and TFMC as evidence that "the line of authority shown on the [NJZ] 'general organization' chart extends to all companies, and the word 'company' whenever used shall be understood to include all allied companies." Dkt. # 153-1, at 37. NJZ used this evidence in an attempt to convince the ICC that NJZ "in fact and in constant practice manages and directs the operation of its subsidiary companies, including [TFMC], without regard to corporate lines of separation . . . ." Id. These statements were made in a brief that NJZ submitted to the ICC. These statements by NJZ give this factor additional weight because, when viewed in the context of other evidence, the commonality of officers and directors between NJZ and TFMC tends to show that NJZ exerted substantial control over the operations of TFMC.

Parent Corporation Finances the Subsidiary/Inadequate Capitalization

The Court will consider the third and fifth Doughty factors together due to the substantial overlap of evidence relating to both factors. The third factor (parent finances subsidiary) concerns the parent company's financial ties with its subsidiary and whether the subsidiary could have survived as an independent entity without financial assistance from the parent. See Milgo Elec. Corp., 623 F.2d at 660-61; Dean Operations, Inc., 896 P.2d at 1019. The fifth factor (inadequate capitalization) requires the Court to consider whether the subsidiary has sufficient capital to function independently of the parent. Cuiksa v. Hallmark Hall of Fame Prods., Inc., 252 F. Supp. 2d 1166,

1177 (D. Kan. 2003). Both parties rely on the opinions of experts to support their differing conclusions as to financial independence of TFMC and the adequacy of its capitalization.

The parties do not dispute that TFMC had initial capital of $50,000 when it was formed in 1906. Dkt. # 159-6, at 11. Each subsequent annual report lists TFMC's capital as $50,000. Dkt. # 153-4. TCI relies on the expert opinions of Dovell to support its argument that TFMC was able to meet its obligations and function independently from it parent corporation. Dovell states that he conducted a balance sheet test based on information contained in TFMC's annual reports to the state of Kansas, and he determined that TFMC was solvent throughout its existence. Dkt. # 161-2, at 11. He determined that TFMC had sufficient capital on hand to operate its business, because he considered the accumulated profit listed in the annual reports as capital, in addition to the initial capital investment of $50,000. Id. at 13. He noted that TFMC initially had debt that allowed it to remain solvent between 1907 and 1914, but he could not determine the source of the loans. Id. at 10, 14. Dovell also opined that TFMC maintained sufficient funds to pay its debts and obligations. Id. at 16. His report does not opine as to the day-to-day financial relationship of TFMC and NJZ, but he does state that the $500,000 dividend payment to NJZ "was not improper." Id. at 17.

Cyprus' accounting expert, Dharan, disputes Dovell's conclusion that TFMC was profitable, and he states that Dovell fails to account for intercompany transfers between TFMC and NJZ. Dkt. # 151-2, at 110. He also states that TFMC lacked sufficient capital or operating history to obtain the loans identified in its annual statements, and the loans were likely intercompany transfers that were listed as loans on TFMC's annual statement. Id. Dharan does not include the profits listed on the annual statements as part of TFMC's capital, because he does not believe those profits were actually retained by TFMC. Instead, he has reviewed historical documents concerning NJZ's

accounting practices and he states that NJZ used a central accounting system in which the funds of a subsidiary were treated as if the funds belonged to a department of NJZ. Id. at 112-13. He concludes that NJZ used a similar centralized accounting practice with TFMC, even though he could not find any financial records showing that TFMC's finances were integrated with those of its parent company. Id. at 114. Based on NJZ's accounting practices, Dharan believes that financial decisions concerning all of NJZ's subsidiaries were made by the Executive Committee of NJZ, but he has no evidence specific to the operation of TFMC. Id. at 115-16. Dharan states that he reviewed evidence supporting a finding that NJZ provided "key finance and accounting services to TFMC," but he does not opine that NJZ financed the operations of TFMC or that NJZ purposefully left TFMC without sufficient operating capital. Id. at 117. Dharan concludes that TFMC was undercapitalized, in part, based on his determination that TFMC's ratio of capital to assets was about 4%. Id. at 126. This is significantly less than other mining companies operating during the same time period. Id.

The Court has reviewed the expert reports of Dovell and Dharan and finds that their opinions do not have sufficient evidentiary support for the Court to make a conclusive determination about the financial relationship between TFMC and NJZ. Dovell relies primarily on annual reports filed by TFMC, but these reports do not provide any basis for the Court to determine if TFMC had sufficient funds to meet its obligations on a day-to-day basis. The reports also do not show if TFMC was financially independent of its parent company or if TFMC was adequately capitalized. On the other hand, Dharan makes conclusions about the financial relationship between TFMC and NJZ based on non-financial records concerning the relationship between NJZ and its subsidiaries generally. This also does not provide the Court with any basis to determine if TFMC had sufficient operating capital or whether NJZ financed the operation of TFMC. The Court understands that both

experts were dealing with an incomplete historical record, but the annual reports and the practices of NJZ in general do not provide a sufficient basis for the Court to determine whether NJZ financed the operations of TFMC or if TFMC was undercapitalized.[9] The Court will take into account Dharan's opinion that NJZ generally operated its subsidiaries using a centralized accounting method, and his opinion that the "profits" of NJZ's subsidiaries may not accurately account for the funds actually held by the subsidiary. However, the annual statements reviewed by Dovell show that at least on paper TFMC appears to have been an independent and profitable company. The Court does not find that the financial evidence supports a finding that TFMC was undercapitalized or the NJZ directly funded the operations of TFMC. This does not preclude a finding that NJZ controlled or dominated the operations of TFMC, but the Court will not speculate as to the financial arrangement between TFMC and NJZ.[10]

Subsidiary Has No Business Except With Parent

Cyprus argues that there is evidence showing that all of NJZ's subsidiaries conducted business solely with NJZ, and that the Court should infer that TFMC had a similar relationship with NJZ. In a War Work report sent to the FTC, NJZ stated that "[a]s a general introduction we would

_____

[9]     In analyzing other Doughty factors, the Court will take into account non-financial evidence that NJZ represented that TFMC was operated as a division or part of NJZ, but the financial records and annual statements in the record are not sufficient to determine NJZ's involvement in TFMC's finances and daily operations.

[10]    The lack of documentation also prevents the Court from reaching any conclusion as to the sixth Doughty factor (payment of expenses by parent). Cyprus relies on statements in Zinc magazine to suggest that NJZ might have paid for materials for TFMC's facility. Dkt. # 151 at 31. By itself, this does not prove that NJZ paid for expenses to operate TFMC or that NJZ paid the salaries of TFMC's employees. TCI argues that it would be speculative for the Court to assume based on the evidence cited by Cyprus that NJZ actually paid TFMC's expenses or salaries, and the Court agrees that the evidence is not sufficient to make a finding as to this factor.

say that all material is charged at cost as it passes into the next department . . . ." Dkt. # 153-2, at

34. In proceedings before the ICC, George represented that NJZ "also acts as sales agent on

commission for [TFMC] as well as the other subsidiaries." Dkt. # 151-2, at 235. Finally, in an issue

of Zinc magazine, NJZ explains that its subsidiaries do not make any money because the subsidiaries

turn their product over to NJZ at cost. Dkt. # 153-1, at 62.

TCI cites the testimony of TFMC's traffic manager, W. A. Moore, before the ICC, in which

he stated:

> Our product, metallic zinc, spelter, is always sold at a price set in the open market
> at St. Louis, which is a basing point for all sales of spelter in this country. That is to
> say, we are not able to add to our production cost a certain percentage for profit and
> then offer our product for sale on that basis, but on the contrary it is necessary for us
> to accept the best price offered in the market from day to day.

Dkt. # 166, at 41-42. The purpose of Moore's testimony was to explain the calculation of freight

rates for shipments of zinc concentrates, and he was not testifying about TFMC's sales practices.

The testimony establishes that zinc concentrates produced by TFMC were eventually sold on the

open market, but he stops short of saying that the product was directly sold by TFMC. Based on

other evidence presented to the ICC, it was still possible that the sales were conducted by NJZ. TCI

takes the reference to the "open market" to mean that TFMC sold the product, but that is not the

clear meaning of the reference to "open market" when other evidence presented to the ICC is taken

into account. Instead, Moore referenced the "open market" as the means of setting the price for the

sale of zinc concentrates.

Cyprus' evidence does show that NJZ represented to others that its subsidiaries did all or a

substantial part of their business with NJZ, but Cyprus does not have any business records of TFMC.

George's statement that NJZ acts as a sales agent for the subsidiaries of NJZ could be interpreted

to mean that the subsidiaries were making sales to entities other than NJZ, especially in light of Moore's statement that zinc concentrate prices were set in reference to the open market. As the Court has noted, Moore's testimony does not explain whether TFMC sold product on its own or through NJZ. The Court does not have sufficient evidence to support a conclusive finding that all of TFMC's business was conducted with NJZ, but the evidence cited by Cyprus does tend to suggest that NJZ exerted substantial authority over the business activities of TFMC.

Subsudiary Is Treated as Department or Division of Parent

TCI argues that Cyprus has not produced any evidence that NJZ expressly referred to TFMC as a department or division of NJZ. Dkt. # 161, at 32. While there may not evidence with that precise language, Cyprus has produced substantial evidence showing that TFMC was actually treated as a department or division of NJZ. During the ICC proceedings, NJZ submitted organizational charts showing its chain of command and general corporate structure, and NJZ produced a chart showing the structure of its manufacturing department. Dkt. # 153-1, at 4. TFMC and other subsidiaries of NJZ are identified as departments or divisions of the manufacturing department that work under the supervision of W.L Coursen. Id. In a separate chart, Coursen is identified as the general manager of manufacturing for NJZ. Id. at 3. Cyprus cites a 1918 issue of Zinc magazine in which NJZ explained that it was necessary to create subsidiaries due to state corporation laws, but the parent company, NJZ, was in complete control of the entire operation of its subsidiaries. Dkt. # 153-1, at 62. NJZ explained that there was no attempt at "concealment" in using a subsidiary to conduct NJZ's operations, because "the [subsidiary] does not make any money, but turns its product over to the parent company at cost." Id. This operational issue was discussed

by NJZ because someone had questioned why it operated under different names in different locations.  Id.

TCI claims that the evidence presented to the ICC does not show that TFMC was treated as a department or division of NJZ, because the sole issue before the ICC was whether NJZ was acting as TFMC's agent when it filed an informal complaint concerning freight charges.  Dkt. # 161, at 33.  While that issue was raised before the ICC, NJZ attempted to prove the agency relationship by showing that NJZ "in fact and in actual practice does exercise such complete control in the general conduct of its and [the subsidiaries'] business . . . ."  Dkt. # 166, at 110.  NJZ produced evidence that the traffic manager of NJZ also occupied the same role for TFMC, and it argued to the ICC that NJZ's "executives and their staff members function without regard to corporate lines of division."  Id. at 111.  When viewed in light of the evidence presented, the Court finds that these statements effectively constitute an admission by NJZ that NJZ and its subsidiaries operated as a single, vertically-integrated company, and that the subsidiaries functioned as departments or divisions of the larger entity.  NJZ stated that its subsidiaries "turned its product over to the parent company" at cost, and this is exactly what a department or division of a larger entity would do.  Cyprus has established that TFMC was treated as a department or division of NJZ.

Directors or Officers of Subsidiary Do Not Act Independently of Parent

The parties do not dispute that NJZ and TFMC had many common officers and directors, but TCI argues that it is entitled to a presumption that officers and directors of NJZ and TFMC wore "two hats" and that the officers or directors were acting appropriately on behalf of TFMC.  See Bestfoods, 524 U.S. at 69-70.  However, this is a rebuttable presumption that can be overcome with evidence that officers and directors were taking action on behalf of NJZ instead of TFMC.  TCI

argues that there is no evidence of daily communications between NJZ and TFMC or that NJZ was responsible for the day-to-day operation of TFMC. Dkt. # 161, at 34. In this case, the Court does not find the absence of evidence particularly meaningful, because experts for both parties have noted significant gaps in the historical record. Instead, the Court will focus on the existence of evidence in the record.

Cyprus cites the minutes of a special operating department convention held in 1920, and notes that A.D. Terrell, the general manager of TFMC and NJZ's manufacturing department, was present at the meeting.[11] J.E. Hayes, vice president of NJZ, suggested that many of subsidiaries, including TFMC, might have to curtail production and operate "at the lowest possible cost" for the benefit of NJZ's operation as a whole. Dkt. # 171-2, at 82. There is also evidence showing that NJZ required its subsidiaries to turn over product to NJZ at cost and that the subsidiaries made no money from turning product over to NJZ. Dkt. # 171-1, at 69. During the ICC proceedings, George testified that he served as the general traffic manager for TFMC and NJZ, but he and other officers of NJZ exercised there duties "without regard to corporate lines of separation . . . ." Dkt. # 171, at 93-94.

The Court finds that the evidence is sufficient to rebut any presumption that the officers and directors of NJZ wore "two hats" and that officers of NJZ and TFMC with dual roles for NJZ and TFMC took actions on behalf of TFMC. Instead, the evidence shows that the officers and directors

---

[11]    Certain evidence cited by Cyprus does not tend to support its argument that TFMC did not act independently of NJZ. Cyprus cites a decision by the State Board of Equalization of California to support its argument that NJZ claimed all profits from the operation of a subsidiary, but this decision was issued in 1943. Dkt. # 171-2, at 89-92. The decision does not concern NJZ's practices during the pertinent time period and the Court does not find that this decision is relevant.

acted for the benefit of NJZ and that NJZ considered its subsidiaries to be part a single entity that functioned without regard to the corporate separateness of its subsidiaries. TCI is correct in arguing that there is nothing inherently improper in two entities cooperating for their shared mutual benefit. Cessna Finance Corp. v. Denver Air Ctr., Inc., 1990 WL 260526 (D. Kan. Dec. 17, 1990). However, the evidence in this case does not show that the officers and directors of NJZ were working toward a shared mutual goal while maintaining clear lines between separate corporations with TFMC. Instead, the officers of NJZ often held roles for NJZ and TFMC, and there is no evidence suggesting that those officers considered the corporate separateness of TFMC as significant.

Formal Legal Requirements Not Observed By Subsidiary

The parties do not dispute that TFMC observed certain corporate formalities, but Cyprus argues that corporate formalities were not regularly observed by TFMC, and that the formalities that were observed often took place in NJZ's corporate offices. Dkt. # 171, at 30-31. The Tenth Circuit has stated that corporate formalities can include activities such as "shareholders' or directors' meetings, minute books, and separate accounting books." Home-Stake Prod. Co. v. Talon Petroleum, C.A., 907 F.2d 1012, 1018 (10th Cir. 1990). TFMC held a shareholders meeting in September 1912, but this is the only record of a shareholder meeting held before TFMC was dissolved in 1926. Dkt. # 162, at 30. TFMC did file annual statements with the state of Kansas during each year of its existence. Dkt. # 162, at 38-76; Dkt. # 163, at 1-33. TFMC appointed a registered agent to receive process. Id. at 34-35. TFMC maintained by-laws and the by-laws were amended at the September 1912 shareholders meeting. Dkt. # 162, at 30-32. TCI also argues that TFMC issued stock, owned property, and contracted and litigated in its own name. Dkt. # 161, at 36. Cyprus responds that TFMC did file annual statements with the state of Kansas, but the annual

statements were drafted in the corporate offices of NJZ.  Beginning in 1914, TFMC's annual statements were signed and notarized in New York, where NJZ maintained its primary office.[12] Dkt. # 162, at 63; Dkt. # 163, at 1-33.  Cyprus also relies on evidence that NJZ may have engaged in centralized accounting and that NJZ paid the federal capital stock tax for TFMC.  Dkt. # 171-2, at 6.

In the summary judgment record, there is evidence that TFMC observed some corporate formalities.  However, there is no evidence that TFMC regularly held its own shareholders' or directors' meetings, and there is evidence suggesting that TFMC's annual statements were prepared by NJZ.  There is a legitimate basis for Cyprus to dispute whether TFMC observed corporate formalities, but this factor does not conclusively favor either party based on the evidence in the summary judgment record.

Other Indicia of NJZ's Disregard of TFMC's Corporate Separateness

The Court finds that it should consider certain evidence that does not fit squarely within the Doughty analysis, because Cyprus has submitted evidence tending to show that NJZ represented to others that it disregarded the corporate separateness of its subsidiaries.  Cyprus argues that NJZ made affirmative representations that it completely controlled and dominated TFMC and that TFMC

---

[12]     The Court has reviewed TFMC's annual statements preceding 1914, and it appears that some annual statements were signed and notarized in Kansas.  However, the copies of the documents submitted are difficult to read due to the age of the documents.  Without clear proof that the documents were executed outside of Kansas, the Court will not infer that all of TJZ's annual statements were prepared at NJZ's offices in New York.

was treated as part of NJZ.[13]  TCI responds that Cyprus is taking statements out of context, and that some of the statements may be inadmissible.

The Court has reviewed the entire transcript of the proceedings before the ICC, and it is clear that NJZ was attempting to convince the ICC that NJZ had the authority to file a complaint on behalf of TFMC.  However, it is the way that NJZ set out to prove this fact that is relevant to the alter ego analysis in this case.  NJZ could have made an argument that it had a limited authority to act on behalf of a single subsidiary, TFMC, for the purpose of filing a complaint with the ICC.  Instead, NJZ made a more general argument that it controlled and dominated all of it subsidiaries and this was the reason that it was authorized to act on behalf on TFMC.  See Dkt. # 171, at 77 ("I had authority to act as general traffic manager of [TFMC], also as general traffic manager of [NJZ] which acts for and in behalf of all of its subsidiary companies); id. at 93 ("That [NJZ] in fact and constant practice manages and directs the operations of its subsidiary companies, including [TFMC], without regard to corporate lines of separation, and constantly exercises its authority to act for and in behalf of its subsidiaries in any and all matters."); id. at 93-94 ("the lines of authority and responsibility of the officers of [NJZ] and their staff members extend to all subsidiary companies."). NJZ expressly disclaimed a more narrow argument that George was authorized to file the specific

---

[13]    Cyprus asks the Court to treat statements made before the ICC as judicial admissions that are binding on TCI.  However, the ICC was not asked to decide whether TFMC was the alter ego of NJZ and there were no binding admissions made to that effect.  Dkt. # 151, at 39. Instead, the ICC was asked to determine if NJZ was authorized to file an informal complaint concerning excessive freight charges on behalf of TFMC.  A "judicial admission" is a "formal, deliberate declaration[] which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute."  U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 833 n.4 (10th Cir. 2005). NJZ did not admit that it completely disregarded the corporate separateness of TFMC, nor was this an issue in the ICC proceedings, and the Court will not treat statements made on behalf of NJZ at the May 9, 1923 hearing as judicial admissions.

claim on behalf of TFMC, and it made clear that it was relying on a more general argument that it had the authority to act for TFMC on all matters. Id. at 98-99. George also clearly stated that he was not acting only on behalf of TFMC when he submitted the informal complaint to the ICC, and he was using the word "company" to refer to the total NJZ organization. Id. at 104.

TCI asks the Court to consider the ICC's ruling to give context to the statements. Dkt. # 174, at 26. TCI also cites other statements by George in which he makes more limited assertions about NJZ's role in supervising TFMC's activities. For example, George referred to NJZ as a "sales agent on commission" for all of its subsidiaries. Dkt. # 174-3, at 64. The hearing examiner inquired as to whether George was suggesting that the ICC could completely disregard the corporate separateness of TFMC, and George responded that NJZ and TFMC were separate corporations. Id. at 104-05. George also stated that he believed that NJZ and TFMC maintained separate bank accounts. Id. at 106.

Although George made certain statements suggesting that he viewed TFMC as a separate entity, it is clear from the entirety of the transcript of the ICC proceedings that NJZ made the general argument that it completely controlled and owned TFMC and that it had the authority to act on behalf of TFMC on all matters. The Court finds that NJZ's representations to the ICC provide compelling evidence that NJZ intended for third parties to believe that TFMC functioned as part of NJZ.

Conclusion

The Court has considered all of the Doughty factors and finds and concludes that TFMC was the alter ego of NJZ under Kansas law. NJZ held itself out as the owner of TFMC's stock and the evidence shows that individuals closely connected with NJZ nominally owned TFMC's stock.

NJZ's officers and directors held the same position with TFMC, and NJZ represented that it controlled the operations of all of its subsidiaries, including TFMC. The financial evidence of TFMC's day-to-day operations is somewhat limited due to the fact that TFMC was dissolved in 1926 and few financial records were maintained following TFMC's dissolution, and the Court cannot conclusively determine if TFMC was undercapitalized or if NJZ directly funded the operation of TFMC based on the existing financial records. The Court has found that there is evidence supporting a finding that NJZ represented to third parties that TFMC did all or most of its business with NJZ, but there are no financial records to conclusively determine that TFMC actually conducted all of its business with NJZ. Cyprus has presented strong evidence that NJZ treated TFMC as a department or division of NJZ and that the officers of NJZ who served in positions for NJZ and TFMC did not consider the corporate separateness of TFMC as significant. The Court also finds that it would be a fraud or injustice to allow NJZ to represent to the ICC that it controlled or dominated the operations of TFMC and to now permit TCI to take a contrary position for the purpose of avoiding CERCLA liability. Considering the totality of the circumstances, the Court finds that Cyprus has made a clear showing that TFMC "ha[d] no separate mind, will, or existence of its own and [was] but a business conduit for the principal." Moorhouse, 913 P.2d at 181. There is no dispute that TCI is the successor-in-interest to NJZ and, based on the Court's finding that TFMC was the alter ego of NJZ, Cyprus may be able to recover contribution from TCI under a theory of indirect liability under CERCLA.

**IT IS THEREFORE ORDERED** that Plaintiff Cyprus Amax Mineral Company's Motion for Partial Summary Judgment and Integrated Brief in Support (Dkt. # 151) is **granted**, and Defendant's Motion for Summary Judgment and Integrated Memorandum in Support (Dkt. # 161) is **denied**.

**IT IS FURTHER ORDERED** that the parties are directed to file no later than **February 13, 2015** a joint status report on the issues remaining for adjudication and a proposed scheduling order.

**IT IS FURTHER ORDERED** that this matter is referred to Magistrate Judge T. Lane Wilson for a supplemental settlement conference in light of this Opinion and Order.

**DATED** this 2nd day of February, 2015.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE