CYPRUS AMAX MINERALS COMPANY,   )
  )
      Plaintiff,   )
  )
v.   )     **Case No. 11-CV-0252-CVE-PJC**
  )
TCI PACIFIC COMMUNICATIONS, INC.,   )
  )
      Defendant.   )

## OPINION AND ORDER

Now before the Court are Plaintiff Cyprus Amax Minerals Company's Motion for Partial Summary Judgment as to Defendant TCI Pacific Communications, Inc.'s CERCLA Liability and Integrated Brief in Support (Dkt. # 213) and Defendant's Motion for Summary Judgment and Integrated Memorandum in Support (Dkt. # 216).[1] Plaintiff Cyprus Amax Minerals Company (Cyprus) has filed a motion for partial summary judgment as to TCI Pacific Communications, Inc.'s (TCI) liability under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (CERCLA). TCI argues that Cyprus cannot establish that TCI is liable under CERCLA and that it is entitled to summary judgment on Cyprus' contribution claims. Dkt. # 216.

## I.

### Procedural History

Cyprus alleges that it is the successor of a company that operated a zinc smelting facility near Collinsville, Oklahoma, and Cyprus was cooperating with state and federal authorities to clean up

---

[1]     Defendant has also filed a Notice of Potential Citation Error in the Court's February 2, 2015 Order on Alter Ego Status (Dkt. # 214). The Court has reviewed the notice and the cited statement in the Court's prior opinion and order (Dkt. # 183), and there is no citation error.

environmental contamination caused by the smelting activities. Dkt. # 2, at 1-2. The original complaint named TCI, Viacom, Inc. (Viacom), CBS Corporation, and CBS Operations, Inc. as defendants. Cyprus alleges that the Bartlesville Zinc Company operated the Bartlesville Zinc Smelter (BZ Smelter), which was located approximately one mile from Collinsville, and Cyprus claims that there was another zinc smelting facility known as the Tulsa Fuel and Manufacturing Zinc Smelter (TFM Smelter) also located about one mile from Collinsville. Id. at 5. The two smelting facilities were located approximately one-quarter of a mile apart. Id. The TFM Smelter was nominally owned by the Tulsa Fuel and Manufacturing Company (TFMC) between 1911 and 1925, but Cyprus alleges that TFMC was the alter ego of the New Jersey Zinc Company (NJZ). Id. As of February 2009, Cyprus was conducting a remedial action at the BZ Smelter site pursuant to a consent decree, and the United States Environmental Protection Agency (EPA) was taking remedial action at the TFM Smelter site. Dkt. # 213-8, at 32. This case does not concern the cleanup work at the BZ or TFM Smelter sites, and Cyprus is not seeking to recover contribution for any response costs incurred at the BZ Smelter site.

In 2009, Cyprus entered into a consent decree with the Oklahoma Department of Environmental Quality (ODEQ) to perform soil sampling and remediation in Collinsville. Id. at 1-36. An action memorandum dated February 20, 2009 describing the purpose and scope of the Collinsville Soil Program (CSP) was attached to the consent decree, and the work that Cyprus agreed to perform in the consent decree was undertaken as part of the CSP. Dkt. # 213-8, at 30-36. ODEQ had determined that investigation and remediation of soil in Collinsville was necessary, because "[h]istoric smelter emissions and transport of smelter material off-site have potentially impacted soil" within Collinsville. Id. at 32. The action memorandum clearly refers to both the

TFM and BZ Smelters as sources of smelter emissions and smelter waste transported offsite. Id. at 31-32. Cyprus admitted for the purpose of the consent decree that it was liable under CERCLA and Oklahoma law. Dkt. # 227-8, at 2-36. On April 26, 2011, Cyprus filed this case seeking cost recovery and contribution under CERCLA under theories that defendants were former owners or operators of the TFM Smelter and that defendants arranged for the disposal or treatment of hazardous substances. Cyprus also alleged a claim of unjust enrichment under state law. The defendants were not the original owners of the TFM Smelter or the parent companies of TFMC, but Cyprus argued that the defendants were the successors and/or indemnitors of NJZ. Id. at 12-14.

The parties requested to initially proceed with discovery and motion practice on the issue of defendants' status as corporate successors of TFMC. Dkt. # 44. The case was assigned to the Honorable Gregory K. Frizzell, and he referred the parties to a magistrate judge for a scheduling conference. Dkt. # 48. The magistrate judge entered a scheduling order on the "corporate issues" phase of discovery. Dkt. # 49. Defendants filed a motion (Dkt. # 53) seeking a determination as to whether federal common law or Kansas law applied to the issue of piercing the corporate veil, and Cyprus responded that Oklahoma law applied to this issue. Judge Frizzell ruled that Kansas law applied to the determination of whether the corporate veil of TFMC could be pierced. Dkt. # 89. The case was reassigned to the Honorable John E. Dowdell. Dkt. # 105. Cyprus filed an amended complaint (Dkt. # 106) naming only TCI and CBS Operations, Inc. as defendants, and the defendants filed a motion to dismiss (Dkt. # 114) many of the claims alleged in the amended complaint. Judge Dowdell entered an opinion and order (Dkt. # 142) dismissing CBS Operations, Inc. as a defendant, and the only claims remaining after this ruling were Court III through VII of the amended complaint as to TCI. Count III and V seek to hold TCI liable for contribution under a theory that TCI was a

former owner or operator of a facility where a hazardous substance was released, and Cyprus alleges in Counts IV and VI that TCI is liable for contribution as an arranger for the disposal or treatment of a hazardous substance. Count VII of the amended complaint seeks a declaratory judgment that TCI is liable to Cyprus for response costs and damages associated with the remediation of contamination in Collinsville.

The case was transferred to the undersigned. The parties filed motions to exclude expert testimony concerning the corporate separateness of TFMC and NJZ, and the Court set a briefing deadline for motions for summary judgment after ruling on the <u>Daubert</u>[2] motions. The parties filed motions for summary judgment concerning the status of TFMC as the alter ego of NJZ. The Court considered the relevant factors under Kansas law for piercing the corporate veil and found that TFMC was operated as the alter ego of NJZ. Dkt. # 183. The Court entered an amended scheduling order (Dkt. # 196) setting the case for a non-jury trial on November 9, 2016. TCI and Cyprus filed motions for summary judgment as to TCI's liability for contribution under CERCLA. The Court struck all remaining deadlines in the scheduling order, including the non-jury trial, pending a ruling on the pending motions for summary judgment.

**Factual Background**

The TFM Smelter was owned by TFMC and it operated from 1911 to 1926, and the TFM Smelter was located about one mile south of Collinsville. Dkt. # 213-2, at 4. In 1992, the Oklahoma State Department of Health (OSDH) conducted a preliminary assessment of the TFM Smelter site for the purpose of determining whether the site posed a risk to public health, and the OSDH collected information to assist the EPA and ODEQ to determine if further action under CERCLA

---

[2]      <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

was warranted. Dkt. # 217-2, at 37. ODEQ later conducted a focused Site Inspection to collect additional information to consider whether the site should be added to the National Priorities List (NPL) or if no further remedial action was necessary. Id. The EPA recommended that the TFM Smelter site be added to the NPL and a search was undertaken to identify potentially responsible parties (PRPs). Id. The EPA has declared that the TFM Smelter site is a CERCLA facility and has placed the site on the NPL. Dkt. # 213-6, at 29, 42-83. From 2005 to 2006, ODEQ conducted a Remedial Investigation/Feasibility Study (RI/FS) and performed sampling of "on-site surface and subsurface soils and waste, off-site surface soils, surface water, sediment, groundwater, vegetation, and air." Dkt. # 217-2, at 6. The sampling identified elevated levels of arsenic, cadmium, and lead in the "on-site surface and subsurface soils, off-site surface soils, surface water, sediment, groundwater, and vegetation . . . ." Id. The EPA conducted a supplemental RI/FS between November 2007 and March 2008, and the objectives of the supplemental RI/FS were to obtain additional data about potential off-site contamination caused by smelter waste and to evaluate the possibility of contamination caused by airborne particulates. Dkt. # 220-2, at 11. The EPA concluded that "few offsite residential properties potentially have been impacted by site contamination and that no undisturbed air dispersion locations appears [sic] to be impacted by the release and dispersion of airborne particulates from the operating smelter . . . ." Id. at 13. However, a small number of offsite residential properties were "potentially impacted by the use of waste mass fill material" from the TFM Smelter site and the cause of contamination at other residential sites could not be definitively determined. Id.

In 1995, ODEQ contacted counsel for Viacom, Inc.[3] to discuss the cleanup of the TFM Smelter site. Dkt. # 213-10, at 2-3. ODEQ believed that Viacom, Inc. was the successor-in-interest to NJZ, and ODEQ cited historical evidence linking TFM and NJZ. Id.. Viacom denied that NJZ exercised control over TFM and, even if such a showing were made, it further denied that it would be liable for any activities that occurred before 1926. Id. at 18-19. In 2000, the EPA invited Viacom, Inc. to enter negotiations for the cleanup of the TFM Smelter site, and the EPA sent a special notice to Viacom, Inc. that triggered a duty for Viacom, Inc. to make a good-faith response within 60 days of receipt of the EPA's letter. Dkt. # 213-6, at 30. Viacom, Inc. again denied that TFM was controlled by NJZ, and Viacom, Inc. declined to take part in any cleanup efforts at the TFM Smelter site. Dkt. # 213-10, at 21-22. ODEQ notified Viacom, Inc. in 2009 that it had determined that waste from the TFM Smelter site had traveled off-site and that Viacom, Inc. was liable for offsite impacts. Dkt. # 213-2, at 220. In response, CBS Corporation denied that it was liable under CERCLA on the ground that TFMC was not the alter ego of NJZ. Dkt. # 213-10, at 26.

In addition to contacting PRPs for the liabilities of the TFM Smelter, ODEQ was also seeking to identify and obtain funds and assistance from the PRPs for the BZ Smelter. The BZ Smelter operated from 1911 to 1918, and it was owned and operated by the Bartlesville Zinc

---

[3]     The complaint alleges that NJZ merged with Gulf & Western Industries, Inc., a Michigan corporation (Gulf & Western Michigan) in 1966, and Gulf & Western Michigan merged into Gulf & Western Industries, Inc., a Delaware corporation (Gulf & Western Delaware). Dkt. # 2, at 12. Gulf & Western Delaware subsequently changed its name to Paramount Communications, Inc. (Paramount), and Paramount was responsible for the liabilities of NJZ. Id. After other sales and mergers, Paramount merged into Viacom International, Inc., and Viacom International Inc.'s parent company, Viacom, Inc., sold Viacom International, Inc. to TCI. Id. at 13.

Company. Dkt. # 106, at 5. The BZ Smelter is located approximately one-quarter of a mile from the TFM Smelter, and the BZ Smelter is also approximately one mile from Collinsville. Id. There is no dispute that Cyprus is the successor-in-interest to the Bartlesville Zinc Company, and Cyprus does not dispute that waste from the BZ Smelter was used for projects in Collinsville. After the BZ Smelter was shut down, the Atcheson Topeka & Santa Fe Railroad installed a steam shovel at the site, and the steam shovel was used to load cinders for use as railroad ballast. Dkt. # 217-1, at 1. In May 1919, a local newspaper ran an advertisement stating that "[b]uildings of all descriptions, firewood, timber, and all kinds of materials along this line, gravel, stones for fixing roads, [and] lots of electrical wire" were for sale at the site of the former BZ Smelter. Id. at 2. However, Cyprus has produced historical evidence suggesting that smelter waste from both smelters was transported off-site and used as construction material in Collinsville. In 1912 and 1913, local newspapers reported that cinders from the "smelters" were used as railroad ballast. Dkt. # 213-2, at 44; Dkt. # 213-4, at 17. The Collinsville News reported in 1913 through 1915 that broken retorts and cinders from the smelters were used to build a road in Collinsville. Dkt. # 213-4, at 36, 39, 42, 49.

Pursuant to a consent decree between Cyprus and ODEQ, "all residential properties, commercial properties, houses of worship, childcare facilities, alleys, vacant fields, parks and schools located within the corporate limits of the City of Collinsville" or any location within one mile of this site has been declared a CERCLA facility. Dkt. # 213-8, at 7. In addition, any place where waste material from the Bartlesville Zinc Company Smelter Site can now be found is also part of the Collinsville CERCLA site. Id. The consent decree fully resolved Cyprus' liability to ODEQ for response costs for the cleanup of hazardous substances in Collinsville, and the consent decree states that the parties negotiated in good faith and the settlement was "fair, reasonable, and in the

public interest." Id. at 4, 8. By entering a consent decree with ODEQ, Cyprus may not be sued for contribution for matters within the scope of the consent decress, and this includes contribution claims under state and federal law. Id. at 18-19.

Smelter operations generated many kinds of solid waste, such as broken and spent retorts and condensers, used refractory brick from furnace linings, and retort residue containing coked reducing coal. Dkt. # 213-2, at 32. The blended and oxidized ore typically found in smelter waste contained a mixture of metals, including zinc, cadmium, lead, arsenic, and sulfur. Id. Smelter waste was used to build bridge supports, roads, and a reservoir at the TFM Smelter facility. Id. at 246, 250, 257. The final remedial investigation report prepared by ODEQ for the TFM Smelter site noted that "[p]revious studies have indicated that approximately seven (7) acres of the site are covered with approximately 30,000 cubic yards of waste consisting of broken retorts and condensers, slag, building debris, ash, bricks," and other smelter waste. Dkt. # 213-4, at 4. In addition, ODEQ actually observed waste materials on the surface at the TFM Smelter site across approximately 25 acres. Id. Historical evidence shows that waste from smelter facilities was used for road construction and repair, and smelter cylinders were used in railroad repair. Dkt. # 213-2, at 44; Dkt. # 213-4, at 17; id. at 49. Newspaper articles refer to using cinders and retorts from "smelters," and this could imply that the cinder and retorts were from the BZ and TFM Smelters. Id. at 26, 36, 39, 42, 45. There is evidence that Tulsa County road crews used black smelter waste from the TFM Smelter "sometime in the 1960s." Dkt. # 213-3, at 239. In other words, there is solid smelter waste on site at the TFM Smelter and there is evidence that some of this waste was moved into Collinsville.

Air emissions were another form of waste that was generated by a zinc smelter. The parties do not dispute that the TFM Smelter generated air emissions and that the air emissions contained hazardous substances such as lead, cadmium, and arsenic. Cyprus's expert, A.J. Gravel, opines that zinc smelters produced two types of air emissions that would have carried hazardous substances away from the smelting facility. The primary source of air emissions came from furnaces used in the smelting process, and neither the BZ Smelter nor the TFM Smelter had any type of system to control air emissions from furnaces. Dkt. # 213-2, at 36-38. There were also fugitive air emissions from waste piles left at smelter sites, and this occurred when wind carried particles from smelter waste deposited on the ground. Id. at 39. The parties dispute whether the air emissions could have reached Collinsville. Gravel opines that both air emissions from furnaces and fugitive air emissions are a possible pathway for the distribution of hazardous substances from the TFM Smelter to Collinsville. Id. In 2007, ODEQ issued its final remedial investigation report for the TFM Superfund Site, and ODEQ found that the data did not "suggest an aerial dispersion plume from the TFM [Smelter] that resulted in widespread contamination." Dkt. # 229-4, at 9. ODEQ noted that the lowest concentration of metals in the soil was more than one mile from the TFM Smelter, and concentrations were typically higher in the areas near the TFM Smelter. Id. TCI's expert, Jay Vandeven, testified in his deposition that air emissions from the TFM Smelter would have followed the prevailing winds and that the aerial emissions would have traveled off-site. Dkt. # 213-2, at 205. However, Vandeven is not an expert on air modeling and he does not intend to offer an opinion as to whether air emissions from the TFM Smelter could have reached Collinsville. Dkt. # 230-2, at 15-16.

Pursuant to its consent decree with ODEQ, Cyprus has undertaken remedial work in Collinsville. The consent decree required Cyprus to implement the CSP, and sampling and remediation began in May 2009 and continued to October 2013. Dkt. # 213-2, at 91. The EPA and ODEQ had entered a memorandum of agreement (MOA) authorizing ODEQ to oversee and direct certain remedial actions pursuant to a Voluntary Cleanup Program (VCP). Dkt. # 213-8, at 87-98. Amy Brittain was the supervisor of the CSP, and she testified that the CSP was part of the VCP. Id. at 45, 47-48. ODEQ stated that the purpose of the CSP was to "sample and test soils found on residential, commercial, and public properties in or near Collinsville that have potentially been affected by the historic zinc smelters, and to remove and replace with clean material those soils that exceed standards established by the [ODEQ]." Dkt. # 213-2, at 232. Cyprus was required to develop a Remedial Action Work Plan, subject to approval by ODEQ, and ODEQ also retained the right to reject a supervising contractor. Dkt. # 213-8, at 8. The action memorandum issued by ODEQ identified both the BZ and TFM Smelters as potential sources of hazardous substances found in Collinsville. Dkt. # 213-2, at 232-33. Cyprus coordinated with ODEQ to determine the size of the site to be tested, and the size of the site was relatively large due to the possible placement of smelter materials at a significant distance from the BZ and TFM Smelters. Dkt. # 213-8, at 85. Before the consent decree had been entered, ODEQ had identified 10 properties with elevated levels of lead, cadmium, and arsenic, and Cyprus was ordered to expedite soil remediation at these properties. Dkt. # 213-6, at 109. Cyprus performed the required soil remediation on an expeditited basis following an Interim Remedial Work Action Plan approved by ODEQ. Dkt. # 213-2, at 92.

The consent decree required that all work performed by Cyprus be consistent with the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), and the soil remediation

activities were to be conducted pursuant to an action work plan developed by ODEQ. Dkt. # 213-2, at 235; Dkt. # 213-8, at 8. The soil remediation standards in the CSP were originally developed jointly by ODEQ and the EPA for the remediation of the TFM Smelter site. Dkt. # 213-10, at 44. The EPA coordinated with ODEQ concerning the preparation of the consent decree and ODEQ stayed in contact with the EPA regarding the TFM Smelter site, but ODEQ maintained oversight and control over the CSP. Dkt. # 229-8, at 8. ODEQ has determined that all of the work performed to date has been consistent with the remedial action work plan and all of the work was necessary to protect human health and the environment. Dkt. # 213-8, at 75.

The parties' experts dispute whether the remedial work undertaken by Cyprus pursuant to the consent decree was necessary and if the work was performed in compliance with the NCP. Vandeven opines that the "majority of the costs claimed by [Cyprus] were not 'necessary costs of response' under the NCP, were not incurred 'consistent' with applicable provisions of the NCP, and have not led to a CERCLA-quality cleanup." Dkt. # 230-2, at 5. Vandeven claims that ODEQ and Cyprus failed to take existing data into account when formulating the CSP, and failed to take into account "sources, migration pathways, and risks associated with the site prior to initiating the CSP," resulting in a remediation program with a "wildly excessive scope and unnecessary costs." Id. at 8. Gravel states that the CSP was performed in substantial compliance with the NCP, and his opinions are based on ODEQ's analysis of Cyprus' work and his own independent analysis. Dkt. # 213-2, at 48-65. Gravel opines that Cyprus has incurred over $30 million in recoverable response costs as of January 14, 2016, and these costs primarily include expenses incurred for investigation, sampling, and soil remediation. Id. at 67.

11

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Cyprus seeks to hold TCI liable for contribution under CERCLA, because it claims that it has incurred response costs pursuant to a consent decree with ODEQ and some of the costs can be attributed to the disposal and release of hazardous substances at the TFM Smelter site. Cyprus argues that TCI can be considered a "covered person" under CERCLA due to its status as a former owner or operator of a facility or as an arranger for the disposal of a hazardous substance. TCI argues that it cannot be held liable under CERCLA, because it did not dispose of any hazardous substance in Collinsville and Cyprus cannot show that its response costs were necessary and consistent with the NCP.

CERCLA provides two mechanisms for a party who has incurred costs associated with the cleanup of hazardous substances to recover some or all of those costs from another PRP. United States v. Colorado & Eastern R. Co., 50 F.3d 1530, 1535 (10th Cir. 1995). One method is a cost-recovery action under 42 U.S.C. § 9607(a), and the other method is a contribution claim under 42 U.S.C. § 9613(f), and Cyprus has only contribution claims remaining at this point in the case.[4] Under § 9613(f)(1), "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . . ." Section § 9613(f) does not itself give rise to liability under CERLCA, and it is merely a means of apportioning liability between and among PRPs. Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc., 100 F.3d 792, 800 (10th

---

[4]     A cost recovery claim under § 9607(a) is unavailable to Cyprus, because the Tenth Circuit has found that a party who seeks reimbursement from another PRP for cleanup costs imposed in a prior lawsuit or administrative order is barred from asserting a claim under § 9607(a). Morrison Enterprises v. McShares, Inc., 302 F.3d 1127, 1133 (10th Cir. 2002). Judge Dowdell dismissed Cyrpus' cost recovery claims in a prior opinion and order. Dkt. # 142, at 7-9.

Cir. 1996). To obtain contribution from a PRP, a plaintiff must initially establish that the PRP would be liable under § 9607, and then the Court proceeds to the equitable apportionment of response costs once the plaintiff has shown that the defendant is liable under § 9607. Sun Co., Inc. v. Browning-Ferris, Inc., 124 F.3d 1187, 1191 (10th Cir. 1997). There are five elements under § 9607 that a plaintiff must prove to make out a prima facie case of liability:

> (1) that the defendant is a "covered person" under CERCLA; (2) that a "release" or "threatened release" of any "hazardous substance" at the site in question has occurred; (3) that the release or threatened release caused plaintiff to incur costs; (4) that plaintiff's costs are "necessary" costs of response; and (5) that plaintiff's response action or cleanup was consistent with the NCP.

Morrison Enterprises, 302 F.3d at 1135.

Initial consideration will be given to TCI's argument that the Court must modify its analysis from the five elements stated above, because this case involves two separate sites and the requirements for "two-site" cases are distinguishable from the ordinary CERCLA claim. Dkt. # 215, at 18-20. In particular, TCI argues that Cyprus' burden to prove causation is greater in a two-site case, because the mere presence in Collinsville of hazardous substances also found at the TFM Smelter is not sufficient to show that TCI caused Cyprus to incur cleanup costs. To establish causation, TCI argues that Cyprus must "(1) identif[y] a contaminant at its site; (2) identif[y] the same (or perhaps a chemically similar) contaminant at the defendant's site; and (3) provide[] evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site." Dkt. # 237, at 10 (quoting Castaic Lake Water Agency v. Whittaker Corp., 272 F. Supp. 2d 1053, 1066 (C.D. Cal. 2003)). Cyprus does not dispute that it will be required to show that the release or threatened release of hazardous substances from the TFM Smelter site caused it to incur costs for the remediation of soil in Collinsville, but Cyprus asks the

Court to reject TCI's argument that the "two-site" analysis modifies the causation element of a prima facie case under § 9607.  The Court has reviewed the parties' filings and their dispute does not actually concern the elements of a prima facie case under § 9607 but, instead, the parties disagree as to Cyprus' burden to show that some substance released from the TFM Smelter actually caused Cyprus to incur cleanup costs.  The Court will use the framework stated in Morrison for a prima facie case of liability under § 9607, and TCI's "two-site" argument will be considered in the context of the causation element.

**Covered Person**

The first element that Cyprus must establish is that TCI is a "covered person" under CERCLA.  Under § 9607(a), there are four categories of covered persons:

> (1) the owner or operator of a vessel or a facility;
>
> (2)  the person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;
>
> (3)  any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ."

42 U.S.C. § 9607(a).  Cyprus argues that TCI is a covered person under a theory that TCI is liable for the disposal of hazardous substances that occurred when the TFM Smelter was owned and operated by NJZ and TFMC.  Cyprus also argues that TCI can be held liable as an arranger, because there is evidence that waste from both the TFM and BZ Smelters was used in Collinsville.  TCI

15

asserts that Cyprus has no evidence of a viable migration pathway from the TFM Smelter to Collinsville, and this precludes a finding that TCI disposed of a hazardous substance. TCI argues that it cannot be held liable as an "owner" or "operator," because it did not own or operate a facility within Collinsville.

In determining whether TCI is a covered person, the first question is whether hazardous waste was disposed of at the TFM Smelter. CERCLA does not directly define "disposal" but refers to the definition of "disposal" found in the Resource Conservation and Recovery Act of 1976, 42 U.S.C. 9601 § et seq. (RCRA). RCRA defines "disposal" as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). There is no dispute that TFMC and/or NJZ disposed of hazardous substances at the TFM Smelter Site. TCI's expert, Vandeven, states that zinc smelters generated waste in the form of slag, spent retorts, spent condensers, and air emissions, and he acknowledges that the TFM Smelter had air emissions that resulted in "particulate matter being transported off-site in the direction of the prevailing wind . . . ." Dkt. # 213-2, at 205; Dkt. # 227-2, at 3. ODEQ found that it was unlikely that any type of air emission control device was used at the TFM Smelter, and ODEQ found approximately 30,000 cubic feet of waste at the TFM Smelter consisting of "broken retorts and condensers, slag, building debris, ash, bricks, and other materials from former smelting operations." Dkt. # 227-4, at 4. The issue is separate from whether any of the hazardous waste disposed of at the TFM Smelter had a viable migration pathway to Collinsville. The issue of causation is separate from whether TFMC disposed of a hazardous substance, and the Court finds

16

that there is evidence that TFMC or NJZ disposed of a hazardous substance by leaving smelter waste at the site of the TFM Smelter.

TCI relies on Pakootas v. Teck Cominco Metals, Ltd., 830 F.3d 975 (9th Cir. 2016), for the proposition that air emissions do not constitute "disposal" under CERCLA. In Pakootas, the Ninth Circuit found that it was bound by a prior decision that direct air emissions from a smelter could not be considered "disposal" under CERCLA. Id. at 983-85. The Tenth Circuit has not directly considered this precise issue, but the Tenth Circuit's decision in United States v. Power Engineering Co., 191 F.3d 1224 (10th Cir. 1999), suggests that the Tenth Circuit would follow Pakootas. In that case, the Tenth Circuit exercised appellate jurisdiction over a challenge by Power Engineering Co. (PEC) to a preliminary injunction entered by the district court. Id. at 1227. A key issue was whether PEC had "disposed" of a hazardous substance, and the Tenth Circuit identified the following three means of disposal:

> (1) the Facility's air scrubbers dispose a mist of hexavalent chromium onto Facility soil; (2) the Facility failed to remediate the soil contaminated by a yellow/orange liquid that leaked from air scrubbers down the west side of the Facility's main building; and (3) the Facility failed to remediate the three open waste piles of contaminated soil excavated from beneath the chrome-plating tanks and the remaining contaminated soil located beneath the chrome-plated tanks.

Id. at 1231. The Tenth Circuit explained that disposal involves the intentional placement of a hazardous substance on land or water, and it narrowly categorized emissions from the facility's air scrubbers as disposal to the extent that mist fell onto the nearby soil. This suggests that the Tenth Circuit would not consider direct air emissions as the disposal of a hazardous substance, but it does leave open the possibility that fugitive air emissions from waste left on the ground could qualify as a type of disposal. Cyprus' expert, Gravel, opines that there would have been fugitive air emissions from the TFM Smelter and that fugitive air emissions were a contributing factor in the dispersion

of hazardous substances from the TFM Smelter. Dkt. # 213-2, at 39. The Court finds that this is sufficient at the summary judgment stage to give rise to a genuine dispute that fugitive air emissions could constitute a form of disposal to establish that TCI is a covered person.

In addition to former owner or operator liability, Cyprus also argues that TCI can be deemed a covered person under a theory that TCI arranged for the disposal of a hazardous substance within Collinsville. Under 42 U.S.C. § 9607(a)(3), "any person who by contract, agreement, or otherwise arranged for the disposal or treatment . . . of hazardous substances owned or possessed by such person" can be considered a covered person for the purpose of CERCLA. CERCLA does not define the term "arranged for" but the Supreme Court has provided guidance on this issue. In Burlington Northern and Santa Fe Ry. Co. v. United States, 556 U.S. 599 (2009), the Supreme Court considered the plain meaning of the word "arranged," and determined that an entity qualifies as an arranger "when it takes intentional steps to dispose of a hazardous substance." Id. at 611. It was not sufficient that the entity knew that a hazardous substance could accidentally be spilled or leaked by a subsequent possessor, and there had to be some evidence that the entity had some intention "that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3)." Id. at 612. TCI argues that there is no evidence that the owners of the TFM Smelter purposefully arranged for the disposal of smelter waste. Id. at 31. However, newspaper articles suggest that both smelters made the waste available to members of the community and were aware that the waste would be disposed of within Collinsville. TCI asks the Court to infer that only the BZ smelter engaged in this type of distribution of smelter waste, but the evidence provided by the parties does not compel such an inference. Instead, the court must view

the evidence in a light most favorable to the non-moving party, and the Court finds that there is a genuine issue as to whether TFMC arranged for the disposal of smelter waste in Collinsville.

TCI argues that it cannot be a covered person under a former owner/operator theory, because it did not own or operate a facility within the area subject to remediation under the CSP. Dkt. # 216, at 17; Dkt. # 228, at 24. The term "facility" is defined as "any site or area where a hazardous substance has been deposited, stored, disposed of, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9)(B). Cyprus does not dispute that TCI cannot be considered the former owner or operator of any property within Collinsville, but it argues that the definition of "facility" is broad enough to encompass any site where a hazardous substance was initially deposited and any additional sites where a hazardous substance came to be located. Dkt. # 213, at 28. The Court agrees that the term "facility" in this case includes the TFM Smelter site and the CSP, because the same hazardous substances were found at both sites and there is a significant likelihood that some of the hazardous substances found in the area of the CSP came from the TFM Smelter. The Court also notes that the primary case cited by TCI supports the imposition of CERCLA liability against the owner or former owner of a facility where a hazardous substance was disposed of and that substance migrated to a facility owned by the plaintiff. See Castaic Lake Water Agency, 272 F. Supp. 2d at 1068-69. The Court will separately consider whether Cyprus has produced evidence that there was a plausible migration pathway that hazardous substances from the TFM Smelter actually did reach the Collinsville Townsite. However, Cyprus has produced evidence giving rise to a genuine dispute of material fact that TCI is the former owner or operator of a facility at which the disposal of hazardous waste occurred.

**Release or Threatened Release of a Hazardous Substance**

Cyprus argues that it can establish the second element of a § 9607(a) claim against TCI, because there is evidence of a release or threatened release of a hazardous substance from the TFM Smelter site. CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant . . . ." 42 U.S.C. § 9601(22). There is no threshold amount of a release or threatened release to establish liability under CERCLA, and any amount of release is sufficient to satisfy this element. Horsehead Indus., Inc. v. St. Joe Mineral Corp., 1996 WL 33415778, *15 (N.D. Okla. Apr. 2, 1996); Dartron Corp. v. Uniroyal Chem. Co., 917 F. Supp. 1173, 1183 (N.D. Ohio 1996).

The Court has reviewed TCI's briefing and it does not appear that TCI contests that there was a "release" of hazardous substances at the TFM Smelter. Instead, TCI argues that there is no evidence establishing that the hazardous substances found in Collinsville came from the TFM Smelter, and this argument is more appropriately considered under the causation prong of a § 9607 claim. For the same reasons as stated in the context of the Court's "disposal" analysis, the Court finds that the hazardous substances were released from the TFM Smelter. See Sycamore Indus. Park Assoc. V. Ericsson, Inc., 546 F.3d 847, 853-53 (7th Cir. 2008) (noting that the definitions of "disposal" and "release" substantially overlap); City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust, 306 F. Supp. 2d 1040, 1053 n.10 (D. Kan. 2003) (same). The Court also notes that while the term "disposal" may not include direct air emissions, the term "release" includes "emitting . . . into the environment." "Environment" is defined to include "ambient air within the

United States." 42 U.S.C. § 9601(8). TCI's expert acknowledges that air emissions from the TFM smelter contained particulate matter that could have contained hazardous substances, and the term "release" expressly includes "emitting" or "discharging" of any hazardous substance, pollutant, or contaminant. Dkt. # 213-2, at 205. Air emissions took place in the form of direct air emissions from the smelting process and fugitive air emissions from smelter waste left at the site of the TFM Smelter. Dkt. # 213-2, at 36-38. Cyprus has also offered evidence that waste from the TFM and BZ Smelters was used in road building and other construction projects in Collinsville, and this can also be considered the "release" of a hazardous substance under CERCLA. United States v. Asarco, Inc., 392 F. Supp. 2d 1197, 1204-05 (D. Idaho 2005).

**Causation**

The most significant dispute between the parties concerns the third element of Cyprus's claim, which is whether the release or threatened release of the hazardous substances from the TFM Smelter caused Cyprus to incur cleanup costs. TCI does not dispute that Cyprus incurred cleanup costs, but it does dispute that there is a plausible migration pathway for hazardous substances from the TFM Smelter to Collinsville. According to TCI, Cyprus has the burden to prove a causal connection between the contaminants found in the Collinsville Townsite and the TFM Smelter in order to establish a prima facie case of CERCLA liability in a two-site case. Dkt. # 216, at 19. TCI cites Castaic Lake Water Agency, and argues that plaintiff should initially be required to establish three elements to prove causation in a two-site case: (1) the plaintiff must identify a contaminant at its site; (2) the plaintiff must identify the same contaminant at the defendant's site; and (3) the plaintiff must provide evidence of a plausible migration pathway from the defendant's site to the plaintiff's site. Id. at 1065. If the plaintiff meets this burden, the defendant must come forward with

evidence tending to show that there is a genuine dispute as to a material fact that would tend to disprove causation. Id.

TCI argues that there is no evidence supporting Cyprus' assertion that air emissions from the TFM Smelter caused Cyprus to incur cleanup costs, because a remedial investigation conducted at the request of ODEQ and the EPA found no environmental impact associated with the dispersion of airborne particulates. Dkt. # 216, at 23-27. In 2007, ODEQ issued a final remedial investigation report concerning the TFM Smelter Superfund Site. The report noted that the BZ Smelter is approximately one-quarter mile from the TFM Smelter, and the TFM Smelter is one and one-third mile from downtown Collinsville. Dkt. # 217-2, at 4. The TFM Smelter site is covered with about 30,000 cubic yards of smelter waste, and the waste piles are uncovered and run-off is not controlled. Id. ODEQ's investigation noted the presence of many metals in the contaminated area, but ODEQ focused on areas of concentration of arsenic, cadmium, lead, and zinc. Id. at 6. Soil sampling was conducted off-site on properties up to one and a half miles from the TFM Smelter, and ODEQ concluded that the "data did not suggest an aerial dispersion from the TFM [Smelter] that resulted in widespread contamination." Id. at 8. Soil sampling was conducted at targeted locations, such as schools, playgrounds, and parks, and other locations ranging from one-half mile to one and a half miles from the TFM Smelter, and properties closer to or adjacent to the TFM Smelter exhibited higher levels of metals in the soil. Dkt. # 217-2, at 93. The EPA ordered a supplemental remedial investigation of the TFM Smelter Superfund Site, and the supplemental remedial investigation included air dispersion modeling. Dkt. # 217-3, at 41, 46. The supplemental remedial investigation concluded that "only a small number of offsite residential sample locations–5 percent–are potentially

impacted by the use of waste mass fill material, with no impact associated with the dispersion of airborne particulates on to the ground in the area surrounding the site." Dkt. # 220-3, at 32.

Cyprus responds that the testing conducted by ODEQ and the EPA was flawed, and even after the remedial investigations ODEQ has consistently referred to aerial dispersion as a plausible migration pathway for the release of hazardous substances from the TFM Smelter site. Dkt. # 227, at 23-27. Cyprus also asserts that a plausible migration pathway can exist even without evidence of actual contamination in Collinsville, because the issue is whether a plausible pathway for the release of a hazardous substance caused Cyprus to incur costs to investigate potential contamination, even if such contamination did not actually occur. Id. at 21. Cyprus initially notes that ODEQ and the EPA investigated the potential for aerial dispersion of hazardous substances from the TFM Smelter because it is a plausible migration pathway. Id. at 22 It appears that ODEQ still considers aerial emissions from both smelters as a historic source of contamination, even though its remedial investigation suggested that aerial emissions have not impacted the soil within the CSP. Dkt. # 227-2, at 233; Dkt. # 227-10, at 44. Cyprus' air modeling expert, Robert Gasparini, Ph.D., testified in his deposition that the data used to create an air dispersion model for the supplemental remedial investigation was incomplete, and he disagrees with the conclusion that there was no contamination from the TFM Smelter caused by aerial dispersion. Dkt. # 227-16, at 32-35. A representative of CH2M, the company that performed the air modeling and soil sampling for the supplemental remedial investigation, testified in her deposition that approximately five percent of the budget was devoted to air modeling, and the air modeling was completed in a three to four week period. Dkt. # 227-12, at 36-37. She also testified that it was difficult to find a pattern or trend to create a model due to the passage of time and the existence of other possible sources of contamination. Id. at 39-43.

TCI's air modeling expert, David Keen, created his own air modeling and he admitted that it was possible that aerial emissions from the TFM Smelter reached Collinsville.  Dkt. # 227-2, at 212-17.

The Court has reviewed the evidence submitted by both parties and finds that there is a genuine dispute as to whether air emissions from the TFM Smelter were a plausible migration pathway for hazardous substances found within the area of the CSP.  Remedial investigations by ODEQ and the EPA found little evidence suggesting that aerial dispersion from the TFM Smelter caused hazardous substances to become located in Collinsville, but Cyprus' expert, Gasparini, has questioned the reliability of the modeling and the conclusions reached by ODEQ and the EPA, and TCI has not moved to exclude Gasparini's opinions.  There is evidence that ODEQ still considers aerial emissions as a potential source for the release of hazardous substances, and it is not clear that the remedial investigations devoted substantial resources to the creation of a reliable air dispersion model.  The company performing the air modeling for the EPA also acknowledged that the passage of time made it difficult to create a reliable air dispersion model or sort out the potential causes of contamination.  The Court cannot rule out aerial dispersion as a potential source for the release of hazardous substances from the TFM Smelter, and finds that there is a genuine dispute as to whether air emissions from the TFM Smelter could be a plausible migration pathway for the distribution of hazardous substances.  Cyprus is also correct that is not necessary for it to prove actual contamination within Collinsville if there was a plausible migration pathway that reasonably caused it to incur response costs to investigate such contamination.  Dedham Water Co. v. Cumberland Farms Diary, Inc., 889 F. 2d 1146, 1154 (1st Cir. 1989); Asarco LLC v. Cemex, Inc., 21 F. Supp. 3d 784 , 807 (W.D. Tex. Mar. 31, 2014); LeClercq v. Lockformer, 2002 WL 907657, *2 (N.D. Ill. May 6, 2002).  In addition, the Court notes that aerial dispersion is not the only type of release of

a hazardous substance identified by Cyprus and, if Cyprus can establish that it incurred costs to investigate or remediate contamination caused by the use of smelter waste in construction or road building projects, this would also meet Cyprus's burden to show that the release or threatened release of a hazardous substance caused Cyprus to reasonably incur response costs.

**Necessary Costs of Response and Consistency with the NCP**

Cyprus argues that the response costs it has incurred to comply with the consent decree are "necessary" and that the cleanup work performed has been consistent with the NCP. Dkt. # 213, at 33-39. TCI asserts that the cleanup costs incurred by Cyprus were not in response to any "actual and real threat to human health or the environment" and the scope of the work performed by Cyprus was excessive in light of the minimal amounts of hazardous substances found within Collinsville. Dkt. # 228, at 40-46. The evidence related to the fourth element (necessity of response costs) and the fifth element (Consistency with the NCP) significantly overlaps, and the Court will summarize the evidence relevant to both elements.

The EPA and ODEQ have found elevated concentrations of metals in the soil within Collinsville and, "[d]ue to the close proximity of the two former smelter sites to the town of Collinsville, the agencies believe that past smelter operations could have resulted in the presence of metals" in Collinsville. Dkt. # 213-6, at 109. The EPA and ODEQ sampled about 200 properties in Collinsville and 10 of the properties, or 5 percent, had concentrations of metals that exceeded the remediation standards for the TFM Superfund Site. Dkt. # 213-2, at 90. In February 2009, ODEQ issued an action memorandum stating that "[h]istoric smelter emissions and transport of smelter material off-site have potentially impacted soil with the city of Collinsville to levels above remediation standards . . . ." Id. at 233. Due to the random distribution of properties with elevated

metal levels, it was necessary to conduct large-scale sampling, because no discernable pattern for property locations with elevated metal levels could be established.  Id.  The agencies determined that a large-scale soil remediation program was necessary for Collinsville.  Id.  ODEQ believed that both the TFM and BZ Smelters were responsible for the higher concentration of metals in the soil, but only Cyprus agreed to participate in the remediation of soil for the CSP.  Id.  The consent decree agreed to by ODEQ and Cyprus defines the "Site" for the CSP to be "all residential properties, commercial properties, houses of worship, childcare facilities, alleys, vacant fields, parks and schools located within the corporate limits of the City of Collinsville or within one mile of such limits . . . ."  Dkt. # 213-8, at 7.  All work performed by Cyprus to comply with the consent decree was required to be consistent with the NCP.  Id. at 8.

ODEQ issued an action memorandum stating that the proposed soil remediation program was consistent with the NCP, and the risk of "imminent and substantial endangerment to public health, or welfare, or the environment" warranted a large scale remediation program.  Dkt. # 213-2, at 234.  Cyprus completed the work required by the remedial action plan for the CSP and ODEQ found that the work was performed to ODEQ's satisfaction.  Dkt. # 213-8, at 68.  In addition to the work required for the CSP, Cyprus also remediated soil at selected properties on an expedited basis, and ODEQ believed that this work needed to be performed quickly due to the presence of children at those locations.  Id. at 69.  Cyprus' expert, Gravel, states that the evidence shows that ODEQ has found that Cyprus' work was necessary and consistent with the NCP, but Gravel has undertaken his own analysis of these issues.  Dkt. # 213-2, at 49-50.  Gravel determined that the CSP complied with the NCP in terms of selecting an adequate remedy and the community outreach associated with the selected remedy.  Id. at 57-58.  Gravel concluded that scope of soil sampling was reasonable and

necessary, and the actual soil remediation activities taken up to the present date represent a CERCLA quality cleanup.  Id. at 65.  As to the costs incurred by Cyprus, Gravel opines that the net amount of costs that can be recovered by Cyprus is $30,014,871 plus $887,970 in prejudgment interest, for a total of $30,902,841.  Id. at 67.

CERCLA response costs include "the costs of investigating and remedying the effects of a release or threatened release of a hazardous substance into the environment."  Young v. United States, 394 F.3d 858, 863 (10th Cir. 2005).  However, the party seeking to recover contribution from another PRP bears the burden to show that the costs incurred are "necessary," which means that the costs must be "closely tied" to the cleanup of a hazardous substance.  Atlantic Richfield Co. v. United States, 181 F. Supp. 3d 898 (D.N.M. Feb. 9, 2016).  This typically includes costs for "investigating and remedying the effects of a release or threatened release of a hazardous substance into the environment."  Young, 394 F.3d at 863.  In addition to showing that response costs are "necessary," Cyprus must also show that the work it has performed is consistent with the NCP.  County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1512 (10th Cir. 1991).  "The NCP is EPA's regulatory template for a 'CERCLA quality cleanup.'"  Public Serv. Co. of Colorado v. Gates Rubber Co., 175 F.3d 1177, 1181 (10th Cir. 1999).  "The NCP is a long and detailed list of procedures that must be carried out by federal and state governments when they are responding to hazardous waste releases," and most of the requirements have been made applicable to private parties performing their own cleanup at CERCLA sites.  Morrison Enterprises, 302 F.3d at 1136. It can be a difficult burden for a plaintiff to establish compliance with the NCP, but this burden is much easier in cases where the plaintiff is conducting a cleanup pursuant to a consent decree with a state or federal agency.  In cases where a party is conducting a cleanup pursuant to oversight by

a state agency, the party is entitled to a rebuttable presumption that its work complied with the NCP when the EPA has determined that the cleanup was being handled in a manner consistent with national standards. Id. at 1138. Cleanups performed by private parties are not required to strictly comply with the NCP, and work will be found consistent with the NCP based on a substantial compliance standard. Public Serv. Co. of Colorado, 175 F.3d at 1182.

The Court finds that Cyprus has produced evidence that at least some of the response cost it incurred were necessary. TCI argues that the scope of work performed by Cyprus was excessive and not reasonably related to the level of contamination present in Collinsville.[5] Dkt. # 228, at 43. TCI also asserts that Cyprus engaged in an overly broad scope of work to avoid potential class action liability for environmental contamination. Id. TCI's arguments concern the amount of response costs that may be deemed necessary, but the evidence is clear that some of the response costs incurred by Cyprus went directly to the investigation of the release of a hazardous substance and the remediation of soil in areas where the concentration of metals exceeded the standard set out in the consent decree. Dkt. # 213-2, at 111-200. TCI may have grounds to challenge whether many of these costs were directly tied to the investigation or cleanup caused by the release of a hazardous substance, but this goes to the amount of recoverable costs, rather than whether Cyprus can establish a prima facie case of CERCLA liability. Gravel's report shows that he considered each invoice submitted to Cyprus by a vendor to determine whether the work performed was necessary and

---

[5] TCI also argues that Cyprus had no objective basis to believe that air emissions could have been a source for the distribution of hazardous substances and, therefore, it was unnecessary for Cyprus to incur costs to investigate possible contamination caused by aerial dispersion. Dkt. # 228, at 42. The Court has already determined there is a genuine dispute as to whether a release of hazardous substances in the form of air emissions could have reached Collinsville, and this finding also prevents the Court from entering summary judgment on the ground that costs to investigate possible aerial dispersion were unnecessary.

properly documented, and he found that most of the costs incurred by Cyprus were closely tied to the cleanup of hazardous substances. Id. at 69. This opinion was based on his own analysis and the deposition testimony of ODEQ's representative. Gravel found that $2,816,431 of the costs invoiced to Cyprus could not be recovered under CERCLA due to lack of documentation or the failure to establish that the costs were necessary. Id. TCI's expert, Vandeven, acknowledged at least some of work performed by Cyprus was necessary, and he did not opine that Cyprus had not incurred any necessary costs. Dkt. # 213-2, at 206. The evidence shows that there may be a basis to dispute the necessity of certain response costs incurred by Cyprus, but Cyprus has produced evidence giving rise to a genuine dispute that some of its response costs were necessary.

The Court also finds that there is a genuine dispute as to whether the work performed by Cyprus was consistent with the NCP. The EPA and ODEQ entered into a MOA defining their respective roles and responsibilities with respect to the VCP, and the CSP is part of the VCP. Dkt. # 213-8, at 48, 87-98. The MOA states that the EPA and ODEQ were working in a coordinated manner with the intention of avoiding duplication of effort, and ODEQ should notify the EPA of work under the VCP. Dkt. # 213-8, at 91. While the VSP is managed by ODEQ, decisions on whether a proposed cleanup is necessary and the quality of the work performed are governed by state and federal law. Id. at 93. Specifically as to the CSP, Cyprus was required to create a remedial action plan that was subject to approval by ODEQ, and the consent decree between Cyprus and ODEQ states that all work undertaken at the CSP be consistent with the NCP. Id. at 8. In a February 20, 2009 action memorandum, ODEQ states that ODEQ and the EPA determined that a large-scale soil remediation progrom was necessary in Collinsville, and ODEQ would ensure that all cleanup work complied with applicable regulations. Dkt. # 213-2, at 235. ODEQ has found that

all of the work performed by Cyprus is consistent with the requirements of the NCP, and ODEQ did not invoke the dispute resolution mechanism to challenge the quality of Cyprus' work. Dkt. # 213-8, at 71-75. Cyprus has also offered the opinions of an expert, Gravel, that the investigation and cleanup work was performed in substantial compliance with the NCP and that the work has been approved by ODEQ. Dkt. # 213-2, at 63-65. TCI argues that Cyprus and ODEQ did not comply with the terms of the MOA, and the rebuttable presumption of compliance with the NCP does not apply due to the lack of EPA involvement with the selection of a remedy and approval of Cyprus' work. Dkt. # 228, at 45. TCI has also submitted an affidavit from Vandeven in which he challenges the basis for Gravel's opinions, and Vandeven opines that the work performed by Cyprus was not a CERCLA quality cleanup. Dkt. # 230-2, at 9-14. At this stage of the case, the Court must view the evidence in a light most favorable to the plaintiff, and the Court may not simply disregard Gravel's opinions and other evidence tending to show that ODEQ believed that Cyprus' work substantially complied with the NCP. Cyprus has produced evidence showing that there is a genuine dispute as to whether its cleanup work performed as part of the CSP substantially complied with the NCP.

## IV.

Based on these findings, the Court finds that Cyprus has produced evidence raising a genuine dispute as to each element of a CERCLA claim under § 9607(a), and Cyprus may be able to obtain contribution from TCI. Due to the existence of genuine disputes as to material facts, the Court finds that Cyprus's motion for partial summary judgment (Dkt. # 213) and Cyprus's motion for summary judgment (Dkt. # 216) should be denied on the issue of TCI's liability for contribution under

CERCLA.[6]  However, TCI's motion for summary judgment includes other arguments that could limit its liability under CERCLA, and the Court will consider these arguments separately as they do not neatly fit with the analytical framework provided by the Tenth Circuit in Morrison Enterprises. These arguments primarily concern the relationship between NJZ and TFMC, and TCI's contribution liability for certain types of response costs incurred by Cyprus.

**Relationship Between NJZ and TFMC**

TCI argues that Cyprus cannot establish a prima facie case of former owner or operator liability against TCI, because TCI's predecessor, NJZ, did not actually own or operate the TFM Smelter facility.  Dkt. # 216, at 36.  TCI also argues that it cannot be held liable for the disposal of hazardous substances that occurred after 1926, because the evidence is undisputed that TFMC ceased operating in 1926.[7]  Id. at 37.

The Court has reviewed TCI's arguments and finds that TCI is effectively seeking reconsideration of the Court's ruling that TFMC was the alter ego of NJZ.  The Court previously acknowledged that NJZ did not actually own the stock of TFMC, but TFMC's stock was owned by employees or officers of NJZ and NJZ represented to the International Commerce Commission (ICC) that it owned the stock of TFMC.  Dkt. # 183, at 16.  There was insufficient evidence to show

---

[6]     The Court notes that there are numerous genuine disputes as to material facts, and these disputes concern TCI's liability as a former owner or operator and arranger under CERCLA.

[7]     In a prior opinion and order (Dkt. # 243), the Court denied TCI's motion to place a temporal scope on its potential CERCLA liability.  The Court rejected TCI's argument that the Court had implicitly limited TCI's liability to acts occurring between February 26, 1918 and June 9, 1923.  In any event, such a temporal limitation would not prevent Cyprus from seeking to hold TCI liable for response costs caused by the "release," as opposed to the "disposal," of hazardous substances that occurred after the stated time period.  See Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc., 191 F.3d 409, 414 (4th Cir. 1999).

that TFMC's sole purchaser was NJZ, but the evidence did show that NJZ exerted substantial authority over sales by TFMC and that NJZ held itself out as operating TFMC as a division or department of NJZ. Id. at 23-24. TCI argued that the Supreme Court has recognized that there is a rebuttable presumption in CERCLA cases that officers and directors with positions in parent and subsidiary wore "two hats." However, the Court found that Cyprus had produced sufficient evidence to rebut this presumption and there was no evidence that corporate officers with positions in NJZ and TFMC "considered the corporate separateness of TFMC as significant." Id. at 26.

TCI seems to be making a distinction between ownership and control over TFMC and the operation of the TFM Smelter, and it argues that it cannot be held directly liable under CERCLA for any hazardous substances disposed of at the site of the TFM Smelter. Dkt. # 216, at 36. This argument ignores the factual findings in the prior opinion and order (Dkt. # 183) and the Supreme Court's decision in United States v. Bestfoods, 524 U.S. 51 (1998). This Court previously considered TCI's arguments that NJZ did not own or control the operations of TFMC, and the Court concluded that Cyprus had shown that TFMC was the alter ego of NJZ and that Cyprus may be able to recover from TCI under a theory of indirect liability under CERCLA. Dkt. # 183, at 29-30. In Bestfoods, the Supreme Court distinguished between indirect or derivative liability of a parent company for the acts of its subsidiary, and direct liability for the ownership or operation of a polluting facility by the parent company. Bestfoods, 524 U.S. at 64. Although this Court did not conclusively rule on the issue of direct liability, its factual findings at a minimum permit Cyprus to proceed with its claims for indirect liability against TCI and TCI can be held liable for contribution based on the disposal of hazardous substances at the TFM Smelter.

**Response Costs Related to Paved Surfaces and Groundwater Contamination**

TCI argues that it cannot be held liable for response costs related to the use of smelter waste in road building and related activities, because Cyprus did not incur response costs to remedy this type of contamination. Dkt. # 216, at 38. TCI also argues that Cyprus has not incurred response costs related to the investigation and cleanup of groundwater contamination. Cyprus responds that the evidence shows that smelter waste used to repair roads and driveways in Collinsville, and the evidence shows that Cyprus incurred approximately $50,000 of response costs to investigate potential ground water contamination. Dkt. # 227, at 44.

The Court has reviewed the evidence and finds that the arguments of the parties are not sufficiently developed to permit the entry of summary judgment on TCI's contribution liability for costs related to paved surfaces and groundwater contamination. There is no dispute that smelter waste was used for road paving and building, but TCI argues that Cyprus has no evidence that it has any response costs related to this use of smelter waste. Cyprus responds that smelter waste "could" have been placed in staging areas or dispersed in transit as it was transported for road building or paving. Dkt. # 227, at 44. It would be premature to rule on this issue based on the evidence presented by the parties, and at a minimum there is a genuine dispute as to whether the use of smelter waste to construct or repair paved surfaces caused Cyprus to incur response costs. As to groundwater contamination, Cyrpus argues that it incurred response costs to investigate groundwater contamination, and it would also be premature for the Court to determine if these costs can be recovered in a contribution claim against TCI.

**IT IS THEREFORE ORDERED** that Plaintiff Cyprus Amax Minerals Company's Motion for Partial Summary Judgment as to Defendant TCI Pacific Communications, Inc.'s CERCLA Liability and Integrated Brief in Support (Dkt. # 213) and Defendant's Motion for Summary Judgment and Integrated Memorandum in Support (Dkt. # 216) are **denied**.

**IT IS FURTHER ORDERED** that the parties shall file a joint status report no later than **July 11, 2017** with proposed scheduling deadlines for a non-jury trial and dates when the parties will be available for a supplemental settlement conference.

**DATED** this 20th day of June, 2017.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE